OTTO SEALEY, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error.*

En Banc.

Opinion Filed May 26, 1925.

1. Unchastity does not raise a presumption of untruthfulness nor disqualify a person from becoming a witness, nor so discredit him as to make his testimony unworthy of belief.

2. To render dying declarations admissible, the court must be satisfied that the deceased declarant, at the time of their utterance knew that his death was imminent and inevitable, and that he entertained no hope whatever of recovery. This absence of all hope of recovery, and appreciation by the declarant of his speedy and inevitable death, is a preliminary foundation that must always be laid to make such declarations admissible. It is a mixed question of law and fact for the court to decide before permitting the introduction of the declaration themselves." * * * It may be gathered from any circumstance or from all the circumstances of the case and is sufficient if the evidence upon such test question satiisfies the judge that the deceased knew and appreciated his condition as being that of an approach to certain and immediate death.

3. In proving dying declarations, only such statements should be received as evidence as relate to what actually transpired, who were the actors, the position of persons, what was said

by the parties, what were the instruments used, who used them, and how, and like matters, excluding if possible, everything except what relates to the *res gestae*.

4. Where dying declarations contain statements relating to a state of hostility or bad blood by the accused towards the deceased such portions of the dying declaration are inadmissible.

3. The physical or mental condition or appearance of a person, or his manner, habit or conduct, may be proved by the opinion of an ordinary witness, founded on observation.

6. Evidence examined and found sufficient to support the verdict.

A Writ of Error to the Circuit Court for Columbia County; M. A. McMullen, Judge.

Judgment affirmed.

*Guy Gillen* and *J. B. Hodges,* for Plaintiff in Error;

*Rivers Buford,* Attorney General, and *Marvin C. McIntosh,* Assistant, for the State.

BROWNE, J.—Otto Sealey was convicted of murder with recommendation to mercy. There are twenty-four assignments of error, but as they practically present but three questions, we will discuss them by subjects instead of by number.

The first seven relate to the exclusion of testimony offered by the defendant to prove that at the time of the killing, the deceased was living in a house of ill-fame, and that the witness J. C. Roberts, a constable, then had a warrant in his pocket for the arrest of Wynn for living in adultery with one of the women in the house.

Unchastity does not raise a presumption of untruthful-

ness, nor disqualify a person from becoming a witness, nor so discredit him as to make his testimony unworthy of belief.

In the case relied upon by counsel for plaintiff in error, it was offered to be proved that the deceased had been *convicted* of keeping a house of ill-fame; a felony under the statute of Oklahoma. The court held that this was improperly excluded, because if the declarant were living and had been a witness, the defendant would have had the right to cross-examine him relative to his conviction of a felony for the purpose of discrediting him, and, should he have denied such conviction, evidence thereof would have been proper by way of impeachment. The court said: "The reason for such rule seems to be that the proof of the conviction of declarant of such a crime, by producing the record thereof, raises no collateral issue of fact, and presents nothing for further inquiry; the record of conviction being conclusive evidence of guilt of the offense."

In the instant case the deceased had not been convicted of a felony so far as the record discloses, nor was any testimony proffered to show such a conviction.

If the testimony tendered by the defendant had been admitted, the entire question of the character of the woman and the reputation of the place as a house of ill-fame would have been opened up, thus presenting a collateral issue of fact.

There is a clear distinction between this class of testimony, and that of conviction of the offense of keeping a house of ill-fame. We think the testimony with relation to the reputation of the two women who lived in the house, and the character of the house, was properly excluded.

The next question presented by the assignments of error is the admission in evidence of certain statements made by the deceased, as dying declarations.

The rule governing the introduction of such testimony

has been laid down by this court: "To render such decla-
ration admissible, however, the court must be satisfied that
the deceased declarant, at the time of their utterance, knew
that his death was imminent and inevitable, and that he
entertained no hope whatever of recovery. This absence of
all hope of recovery, and appreciation by the declarant of
his speedy and inevitable death, is a preliminary founda-
tion that must always be laid to make such declarations
admissible. It is a mixed question of law and fact for the
court to decide before permitting the introduction of the
declarations themselves." * * * It may be gathered
from any circumstance or from all the circumstances of the
case and is sufficient if the evidence upon such test ques-
tion satisfies the judge that the deceased knew and appre-
ciated his condition as being that of an approach to certain
and immediate death." Lester v. State, 37 Fla. 382, 20
South. Rep. 232.

There were three alleged dying declarations introduced
in evidence over the objection of the defendant, two verbal
and one in writing. Nathan Thomas testified that the de-
ceased said he "could not recover," and that he was "going
to die." At another point, he said "there was no chance
for him," and that "the shots were going to kill him."
J. C. Roberts' testimony on this point was substantially the
same.

The denying declaration was then admitted in evidence,
which is as follows: ' 'He said that he had started down to
Otto Sealey's place to get some kerosene and matches, and
he said that Otto said to him, "God damn you, what did
you tell Babe Douglas that I was selling liquor for? Wynn
said that he told Otto that he did not tell Douglas that; he
said that he was unarmed, that he did not even have a
pocket knife, and he said that Otto was going to shoot him,
and he started to run, and shot him and the second shot
paralyzed him so that he fell, and after he fell that Otto

ran up and shot him three more times, and he shot him after he fell on the ground.''

J. C. Roberts testified that the deceased asked him ''to get some one to take his dying statement, that he was going to die,'' and he also heard him say, ''he would never get well.''

With regard to the deceased's belief that death was impending, he testified: ''Q. While in the hospital did he express any hope of surviving or getting well from the wound that he had? A. He did. Q. Did he state then and there that he would get well? A. He stated that he would not get well. Q. Did he state that he would die? He stated that he would not get well. Q. Did he state that he would die? A. Yes, sir. Q. How many times did he state to the best of your judgment, after he reached the hospital, that he had no hope of getting well? A. Only once. Q. How many times you would say that you heard the deceased state that he was going to die, after he got to the hospital? A. Two or three times.''

The other verbal dying declaration was then admitted in evidence and is as follows: ''He said that he shot at him the first time and missed him, and then he shot him again, and when it hit him it seemed to paralyze him in a way all over, and he fell right on his face, and that while he was down Otto ran up and shot him in the back again and hit him one more time.''

It appears from the record that subsequently, while the wounded man was being prepared for an operation in the hospital, a written statement was drafted which he signed with his mark.

That declaration is as follows: 'I want to make a statement as to how I got shot as the doctor says that I have very little chance to live, and I believe that I am in a dying condition. Otto Sealey shot me and this is how it happened. I was talking to Steve Dukes and Charlie ———

when Otto Sealey came up and said, Oh dam you, you went and told Babe Douglas I was selling whiskey, at that, he, Sealey, reached back and drew a gun and shot at me and missed me. I turned and ran as I had no way to protect myself, no gun, no knife, or anything; he was then about sixteen feet from me, and when I turned and ran—he shot again.. I seemed to get numb all over, and fell, and then he came up and fired three more times at me. We had no quarrel and I did not know that he was even mad with me. This was out there near Watertown."

Although the three dying declarations introduced in evidence differ somewhat in the details, we think they show that the deceased knew and appreciated his condition and believed that death was certain and impending. The objections to their introduction were properly overruled.

The assignments of error that relate to the statement in the dying declaration, "we had no quarrel and I did not know that he was even mad with me," are not well taken.

The rule that excludes extraneous matters from dying declarations is thus laid down by this court: "In proving dying declarations, only such statements should be received as evidence as relate to what actually transpired, who were the actors, the position of persons, what was said by the parties, what were the instruments used, who used them, and how, and like matters, excluding, if possible, everything except what relates to the *res gestae.*" Malone v. State; 72 Fla. 28, 72 South. Rep. 415.

The rule laid down by nearly all the authorities is that where dying declarations contain statements relating to a state of hostility or bad blood by the accused towards, the deceased, such portions of the dying declarations are inadmissible. See notes to State v. Johnson, 41 R. I. 253, 103 Atl. Rep. 741, 14 A. L. R. 757, *et seq.* Ben v. State, 37 Ala. 103; Mose v. State, 35 Ala. 421.

The statement complained of did not show any state of hostility or bad blood by the accused towards the deceased; on the contrary it negatived any such condition.

We do not think the expressions objected to offend against the rules cited. The deceased expressed no opinion on any matter that could be injurious to the defendant, and were irrelevant and immaterial.

The 20th assignment of error relates to the overruling of an objection to the question propounded to a non-expert witness: "what was the condition of his mind, was it rational and normal?" to which the witness replied, "He seemed to be normal, yes, he was in his senses alright."

The rule as laid down by this court is, "The physical or mental condition or appearance of a person, or his manner, habit or conduct, may be proved by the opinion of an ordinary witness, founded on observation." Mitchell v. State, 43 Fla. 584, 31 South. Rep. 242; Fields v. State, 46 Fla. 84, 35 South. Rep. 185; Sylvester v. State, 46 Fla. 166, 35 South. Rep. 142; Leaptrot v. State, 51 Fla. 57, 40 South. Rep. 616; Sims v. State, 59 Fla. 38, 52 South. Rep. 198.

There was no error in overruling the objections to this and other similar motions.

No useful purpose will be served by giving a summary of and discussing the testimony. There was ample evidence to support the verdict.

Finding no errors, the judgment is affirmed.

WEST, C. J., AND WHITFIELD, ELLIS, TERRELL AND STRUM, J. J., concur.