W. G. Mc RANE v. STATE.

194 So. 632
Division A
Opinion Filed March 15, 1940

*A. P. Buie* and *G. A. Buie, Jr.,* for Plaintiff in Error;
*George Couper Gibbs,* Attorney General, *Thomas J. Ellis,*
and *Wm. Fisher, Jr.,* Assistant Attorneys General, for Defendant in Error.

BUFORD, J.—On writ of error we review judgment of
conviction of murder in the first degree with recommendation of mercy.

The record shows that there was a motion for change of
venue which alleged two grounds, as follows:

"(1)   Because of the fact that the family and relatives
of Eugene Barber, the person on account of whose death
this defendant is charged with homicide, have an undue
influence over the minds of the inhabitants of this county.

"(2)   Because of the fact that it is impracticable to
obtain a qualified jury for the trial of this cause in this
county."

Affidavit in support of the motion alleged:

"Affiant swears that he has spent approximately five
days in Dixie County, Florida, in investigating the case
with the view in mind of preparing his defense to said
above charge.   That he has talked to many people, inhabitants of Dixie County, Florida, about the said case.
That in every instance, without a single exception, each and
every one of said persons have advised affiant that it will be
absolutely foolish, useless, and a very dangerous thing to
attempt to try said cause in Dixie County, Florida.   Many
reasons were given for such statements; among them being
that McRane, a fearless officer of the State Game and Fresh
Water Fish Department, has made many enemies in Dixie
County in enforcing the game laws without fear or favor;

that the people of Dixie County as a whole, have not in the past obeyed or conformed to said laws, and feel that said laws take away rights that have been theirs for years and years; and that McRane, in enforcing such laws has made many enemies who will work against him in every way they can. Another reason given being that feeling ran so high against McRane the day he was arrested for the killing of Barber that the Sheriff of Dixie County, fearing mob violence, acted wisely and judiciously in rushing McRane away from Dixie County jail to a jail unknown; that had he not done so, the chances are that McRane would have been taken away from the officers and killed by said mob; and that while no one is talking or saying anything about the case, and in fact refuse to say anything about it, such feeling still exists very strongly against McRane, in Dixie County. That in event McRane was not taken from the officers prior to his trial, and happened to secure an acquittal of the charges against him, then it was an almost certainty that he would never leave the county alive, that he would be killed. The main reason underlying all the objections were that the deceased, Eugene Barber, was of kin, either by blood or marriage to over fifty per cent of the people of Dixie County. That his family was so strong, politically and/or economically, that it would be useless to try and overcome the undue influence that such family exercises over the inhabitants of Dixie County. That while there were a few people in Dixie County who would be able to withstand the undue influence of such family and relatives, and not be swayed in reaching a verdict according to the evidence, that the number of such were so small that it was not worth considering. That a close kinsman of deceased is a member of the Board of County Commissioners of Dixie County, has

hundreds of friends over the county, and is taking an active interest and part in the prosecution of McRane. That such kinsman's influence alone is sufficient to secure a verdict against the defendant, McRane, and that it is almost suicide for McRane to attempt to try said cause in Dixie County.

"Among other reasons given was that the killing occurred on November 29, 1938, that McRane was immediately rushed away from Dixie County, Florida, on account of fear of mob violence; that although feeling was at such a high pitch, and although a regular term of circuit court would be held in a little over a month, a special term of said court was called and McRane was indicted for first-degree murder on December 21, 1938, brought up for arraignment on December 22, 1938, when feeling was very high against the said McRane, and that it appeared that McRane was being rushed to trial and not being given sufficient time in which to prepare his defense; that while they were not criticising the court in any manner, yet it appeared that because of the prominence of the deceased's family, amounting to undue influence, such special term of the court was called; that had it been a killing of some one other than a member of the Barber family, a special term of the court would not have been called. Affiant further swears that in many instances people whom he contacted advised him plainly that they did not know him, did not know whether they could trust him or not, that they did know the Barber family, and were not going to discuss the case at all, and nothing that affiant could say would budge them one bit. Even when affiant pointedly told them that a man's life was at stake, they then refused to talk, or to have anything whatsoever to say about the case. Affiant further swears that in every instance, where he and the persons to whom he talked, and who talked to him, and

they had advised him of the conditions which are set forth in this affidavit, he then asked or requested such parties to make an affidavit setting up such facts, without a single exception, the people advised affiant that they could not afford to make such an affidavit because of the strong political and/or economic influence of the Barber family. That such influence was so strong that if they signed such an affidavit, they would be immediately placed on a 'Black List,' and no business would be given them by the Barbers, relatives or friends, and they simply would not make an affidavit, although the facts as stated above were true. That they had to make a living, and as business wasn't the best in the world, they couldn't afford to risk having any part of what they had taken away from them. Others have as reasons for not signing affidavits that they were in politics, and were friendly to the Barbers and, therefore, couldn't sign. That the influence of the Barber family was so strong that they couldn't afford to try, in any manner, to oppose it. Many others stated that the Barber family, realizing that the defendant would try to move the case from Dixie County, Florida, to another for trial, had purposely avoided being present at the arraignment of McRane on December 22, 1938, so as to prevent the case from being taken out of Dixie County for trial; that they felt that if the case was tried in Dixie County a conviction would be secured, but if it were taken out of Dixie County, they felt that McRane would be acquitted, and therefore stayed away from the court house when McRane was brought for arraignment. Affiant further swears that, with a few exceptions, it has been impossible to secure affidavits setting out the above facts from inhabitants of Dixie County; that he has had four people trying, along with himself, to secure such affidavits, and each of such persons

has advised affiant that the reasons set out above were the reasons why the people they had contacted had refused to sign affidavits; that no person had stated that it was possible to secure a qualified jury in Dixie County, Florida, to try said cause, but on the other hand, and in each and every instance such inhabitants of Dixie County had stated that it would be impracticable to secure a qualified jury in Dixie County, but refused to sign the affidavits for the reasons given above. Affiant further swears that, in his opinion, judging from what the inhabitants of Dixie County have told him, and judging from the manner in which the inhabitants have acted and/or talked when approached for the affidavits, that it is very impracticable to secure a qualified jury in Dixie County, Florida, to try said cause; that it would be unsafe and dangerous to try said cause in Dixie County, Florida."

Numerous affidavits were filed by the State in support of its traverse of the motion, typical of which is one as follows:

"The affiant heard of the killing of Eugene Barber soon after said person came to his death; that affiant has heard the case of the killing of said Eugene Barber discussed some generally by some of the people in his section of the county in so far as said case has been discussed; that affiant from day to day meets various, divers and sundry of the people who live in his section of the county; affiant further says that he is posted as to the condition of public opinion and sentiment in his section of the county; that public opinion and sentiment in his section is not aroused against W. G. McRane, or any one else in connection with the killing of said Eugene Barber, or any other matter to any extent as to prevent rendition of justice as provided by law.

"Affiant further says that from his knowledge of the

people and conditions in Dixie County, Florida, and especially that section in which affiant lives, he is of the opinion and is satisfied that fair and impartial men can be secured in Dixie County, Florida, and from affiant's section thereof, qualified for jury service, and who have not formed an opinion in regards to the case against said defendant securing a fair and impartial trial in said County of Dixie.

"Affiant further says that he is acquainted with the general standing of the family of the deceased, Eugene Barber, and says such family and relatives of said Eugene Barber have no undue influence over the minds of the inhabitants of this county with reference to the case above mentioned."

The trial court called and caused to be examined numerous witnesses to testify as to whether or not it would be practical for the defendant to procure a jury which would give him a fair and impartial trial in Dixie County. Some twenty-five witnesses were called and examined. Some testified that in their opinion it would not be practical to procure a fair and impartial jury. Some testified that in their opinion it would be practical to get such a jury, and others testified that they thought it was possible to get such a jury.

The trial court deferred ruling on the motion until after trying to get a qualified jury.

Fifteen jurors were called, exhausting the regular panel present. One hundred special veniremen were drawn from the box and summoned. This special venire was exhausted. Another special venire of 119, being all the names in the jury box, were called and examined.

The defense exhausted its ten peremptory challenges. The State exhausted five peremptory challenges. Two hundred and one of all talesmen of 234 called were disqualified because of relationship or because of having

formed or expressed an opinion as to the guilt or innocence of the accused. It appears that of these between fifty and sixty were related to the deceased. Attorneys and the trial judge very carefully and thoroughly examined the talesmen.

The motion for change of venue was denied. It appears to be conceded that the family of which deceased was a member is one of the largest families in the small County of Dixie; that it is one of the oldest, most respected and most influential families in the county. The evidence fully supported the first ground alleged in the motion, *supra*.

Considering all the facts and circumstances which were before the court, we feel that the denial of the motion for change of venue was prejudicial error. See Blackwell v. State, 76 Fla. 124, 79 Sou. 731; Johnson v. State, 112 Fla. 189, 150 Sou. 287.

Question number Three presented by plaintiff in error is:

"Where on preliminary examination one witness has testified and given an alleged oral dying declaration, and defendant then proffers testimony of three witnesses, one the nurse in charge of the deceased; one a medical doctor in attendance; and one a deputy sheriff who went to secure a dying declaration; the last two being State's witnesses; to show that the condition of mind of deceased at such time testified to was such that he, the deceased, did not feel or believe that he was in danger of immediate or imminent death, and had not given up hope of recovery; is it error for trial court to refuse to hear the proffered testimony, and without full investigation, admit the testimony of the one witness as a dying declaration?"

The State introduced a witness whose testimony tended to prove the necessary conditions to bring a statement alleged to have been made by the deceased within the rule to be admitted as a "dying declaration." The testimony

of the witness showed that the nurse. the physician and a deputy sheriff were in the room when and where the matters about which he testified transpired. The examination of the witness for the purpose of determining whether or not the evidence was admissible was not in the presence of the jury. Thereupon, the following occurred:

"By Mr. Buie: The defendant offers to show to the court at this time, by the three witnesses, Chris Anderson, Dr. Davis and Evelyn Harrell, the condition of the mind of the deceased immediately prior to the time that the alleged dying statement was made to Mr. Chavous, and that during such time and immediately thereafter that the deceased did not feel or believe that he was in danger of immediate and imminent death, and had not given up hope of recovery.

"By the court: As the court understands the rule and the law relative to questions of this nature, the court is without authority to hear and consider for himself and decide as to the credibility of the testimony of Mr. Chavous, as that is a question for the jury to determine. Right now the duty of the court is to determine whether or not under the circumstances as testified to by Mr. Chavous, the alleged dying declaration is admissible in evidence. If the defense then desires to attack the truthfulness or credibility of the testimony of Mr. Chavous, by adverse testimony thereto, then the testimony of such impeaching witnesses will go to the jury for their consideration and decision as to who they will believe; however, the court does not feel that it is within his province to do so at this time, but that the credibility of witnesses is a question solely within the province of the jury, and not for the court, and the court should be careful not to invade the province of the jury in that respect. Therefore, the court declines to hear at this

time testimony intended as impeachment of the testimony of Mr. Chavous and under the testimony given by Mr. Chavous it appears that the alleged dying declaration is admissible, but full and free opportunity will be accorded defendant to introduce impeachment testimony for the consideration by the jury.

"The jury is recalled into the box, and the trial proceeded as follows:"

This constituted reversible error.

In Lester v. State, 37 Fla. 382, 80 Sou. 230, this Court laid down the rule in this jurisdiction which has never been modified, saying:

"Dying declarations in cases of homicide form an exception to the rule against the admissibility of hearsay evidence. The law regards the declarant, when in the presence of imminent and inevitable death, as being under as solemn an inspiration to tell the truth as though he were pledged thereto by oath. To render such declaration admissible, however, the court must be satisfied that the deceased declarant at the time of their utterance knew that his death was imminent and inevitable, and that he entertained no hope whatever of recovery. This absence of all hope of recovery, and appreciation by the declarant of his speedy and inevitable death, is a preliminary foundation that must always be laid to make such declarations admissible. It is a mixed question of law and fact for the court to decide before permitting the introduction of the declarations themselves. *The judge hears all pertinent evidence that exhibits the state of mind of the deceased at the time of making his assertions, as to whether he appreciated his near and inevitable approach to death, and as to whether he was without any hope of recovery,* and if satisfied by such evidence that the declaration was made under

such circumstances as makes it legally admissible, it should be admitted. Should there be conflict in the evidence touching such preliminary test for the admission of such declaration, it is the judge's duty to weigh and settle it. It is not necessary that the evidence upon such preliminary test should consist of express utterances of the deceased to the effect that he knew he was going to die, or could not live, or would never recover. It may be gathered from any circumstance or from all the circumstances of the case, and is sufficient it the evidence upon such test question fully satisfies the judge that the deceased knew and appreciated his condition as being that of an approach to certain and immediate death. 1 Roscoe's Criminal Evidence (8th ed.), page 53, *et seq.;* State v. Nash and Reduct, 7 Iowa 347; Dixon v. State, 13 Fla. 636; Roten and Thompson v. State, 31 Fla. 514, 12 South. Rep. 910; 1 Greenleaf on Evidence (15th ed.), Secs. 156 to 162, inclusive; People v. Gray, 61 Cal. 164, S. C. 44 Am. Rep. 549." (Emphasis supplied.) See also Sealy v. State, 89 Fla. 439, 105 Sou. 137; Frier v. State, 92 Fla. 241, 109 Sou. 334; Copeland v. State, 58 Fla. 26, 50 Sou. 621; Handley v. State, 125 Fla. 632, 170 Sou. 748.

So it was the duty of the trial court to hear all available evidence as to the state of mind of the declarant at the time the statement was made, and from such evidence determine whether or not the statement was admissible as a dying declaration.

The matter to be decided is not altogether what the real condition of the declarant was. It must be shown that the declarant was, *in extremis,* near to impending death; but although this may be clearly shown, if it appears that the declarant did not realize that condition, and in spite of what was apparent to others, he entertained the thought

or hope that he would recover or that death was not yet imminent or close at hand, his declaration would not be admissible in evidence as a dying declaration, though it might be admissible if made in the presence of the accused.

Whether or not the trial judge might have held the evidence of dying declaration admissible after hearing all the witnesses proffered by the defendant is not for our determination. The record shows reversible error in that all such evidence was not heard and considered by the trial court before ruling on the admissibility of the evidence as a dying declaration before allowing it to be submitted to the jury.

Without the alleged dying declaration the evidence was entirely insufficient to support the verdict rendered. Whether or not it may have been sufficient to support a verdict for a lesser degree of unlawful homicide, we express no opinion.

For the reasons stated, the judgment must be reversed.

So ordered.

Reversed.

TERRELL, C. J., WHITFIELD, CHAPMAN and THOMAS, J. J., concur.

Justice BROWN not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.