528 So.2d 353 (1988)
Joseph Henry GARRON, Appellant,
v.
STATE of Florida, Appellee.
No. 67986.
Supreme Court of Florida.
May 19, 1988.
*354 James Marion Moorman, Public Defender and Douglas S. Connor, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and Kim W. Munch, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
This cause is before the Court on appeal of a conviction of first-degree murder and a sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons which follow, we reverse both the conviction and the sentence. Although any one of these reasons would warrant reversal, we address each point of error as a guide for the trial court in the retrial of this case.
On the night of November 11, 1982, the appellant, Joseph Henry Garron, shot and killed his wife, Le Thi, and his step-daughter, Tina. Appellant's other step-daughter, Linda, escaped the shooting physically unharmed and later testified against appellant. Linda, who was fourteen years old at the time of these events, testified at trial that on the night of the shooting appellant had been drinking wine at home and was in a foul mood. She stated that appellant touched the outside of her thigh and made an obscene remark just as her mother, Le Thi, arrived in a car with Tina. Linda ran outside to Le Thi for protection. Le Thi entered the house and began arguing with appellant, threatening to take the children away.
While it is unclear how long the argument lasted, Linda testified that she saw appellant get a gun and hide it under a towel. She heard two shots fired and saw Le Thi collapse with a chest wound. Tina then ran to the telephone, called the operator, and requested the police. Appellant followed Tina to the phone, leveled the gun at her, and fired. At this point, Linda ran to a neighbor's house hearing shots fired which she presumed were aimed at her. *355 Upon the arrival of police, appellant, who had apparently shot himself, was read his Miranda rights and taken to the hospital.
Appellant's sole defense at trial was insanity. To this end, all three court-appointed psychiatrists testified that appellant did not know right from wrong and was, therefore, insane under the legal definition of insanity. The only rebuttal to this defense presented by the state was the testimony of Linda Garron and the law enforcement officers that, in their lay opinion, appellant appeared to be sane. It should be noted pursuant to the claim of insanity that, while awaiting trial, appellant was twice declared incompetent to stand trial and was sent to the state hospital at Chattahoochee.
Following a verdict of guilty and judgment of conviction, the jury returned advisory sentences of death on both counts. The sentencing judge rejected this recommendation as to the murder of Le Thi, sentencing appellant to life imprisonment. The judge accepted the jury's recommendation as to Tina and entered a sentence of death. This appeal followed.
Appellant's first contention is that he was denied due process of law as a result of comments made by the prosecutor regarding the invocation of his Miranda rights. During the direct examinations of the arresting police officers, the prosecutor asked each whether appellant appeared to understand his Miranda rights. During direct examination of rebuttal witness, Detective Phillips, the prosecutor asked two questions: whether he believed appellant was "coherent," and whether appellant indicated he understood his constitutional rights. Detective Phillips answered yes to both questions. The state contends that this procedure was proper to show appellant's state of mind at the time of the crime in order to rebut the sanity defense.
In State v. Burwick, 442 So.2d 944 (Fla. 1983), cert. denied, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984), this Court held as inadmissible "evidence of a defendant's post-arrest conduct, including silence and the request to see an attorney after receiving Miranda warnings, as it relates solely to the issue of mental condition near the time of the offense when the defendant has asserted the insanity defense and the evidence is presented by the state in rebuttal." 442 So.2d at 945 (citation omitted). The Court reasoned that to penalize a defendant for exercising his constitutional rights would violate "a fundamental principle of our constitutional law." Id. at 947. There is little doubt that the admission of such evidence would raise an inference of guilt or, in this case, sanity. More recently, the United States Supreme Court in Wainwright v. Greenfield, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), held that because Miranda warnings carry an implied promise that "silence will carry no penalty," Id. at 295 (quoting Doyle v. Ohio, 426 U.S. 610, at 618, 96 S.Ct. 2240, at 2245, 49 L.Ed.2d 91 (1976)), use of a defendant's post-Miranda silence as evidence of sanity violates due process. Id.
In the present case, appellant contends that he was penalized severely for invoking his constitutional rights, and then replying that he understood them. The state argues that because the evidence was not expressly used for proving sanity neither Burwick nor Greenfield controls. To this end, the state argues that the prosecutor's questions cannot be construed as comments on the exercise of constitutional rights. The state further contends that if it was error to allow either of these questions, the error was harmless.
It should be noted that, with respect to the questioning of Detective Phillips by the prosecutor on rebuttal, the questions were directly and expressly related to the insanity defense. The question regarding appellant's coherency was immediately followed by the question of whether he appeared to understand his Miranda rights. Because "coherency" is significant in terms of sanity, these questions are fairly susceptible to an interpretation that they were comments by the prosecutor on appellant's sanity. It is not dispositive that the prosecutor did not expressly comment on the exercise of appellant's constitutional rights. However, when taken in context, it is clear that the questions asked by the prosecutor were intended to at least impliedly be a comment *356 on the invocation of those rights as they relate to appellant's guilt or sanity. As we stated in Burwick, "[p]ost-arrest, post-Miranda silence is deemed to have dubious probative value by reason of the many and ambiguous explanations for such silence." 442 So.2d at 948.
The questions asked by the prosecutor in this case are precisely the sort of comment the United States Supreme Court condemned in Greenfield.[1] Any distinction between the questions asked in Greenfield and the questions asked in the case at bar is imagined. They are similarly worded and have the same effect. It is clear that the effect of the questions in both cases was to deprive the respective defendants of their right to due process by penalizing them for invoking their constitutional rights.
There is no merit to the state's argument that allowing these questions was harmless error. We believe that under our analysis in State v. DiGuilio, 491 So.2d 1129 (Fla. 1986), it cannot be said beyond a reasonable doubt that the questions and answers elicited did not contribute to appellant's conviction. Therefore, the error was not harmless.
Appellant also contends that the trial court erred in allowing William Webb, the former assistant state attorney originally charged with prosecuting this case, to testify as to his lay opinion that appellant was sane. While we believe it was proper for Webb to testify[2] in light of the jury instructions given as to weight and credibility accorded such a witness, the content of his testimony is somewhat suspect. Webb's contact with appellant began with the first appearance hearing conducted the day after the shooting. Webb testified that, at this hearing, appellant did not, in his opinion, appear to be psychotic or insane under the legal definition of sanity.
Webb was permitted to give this testimony regarding the legal and medical conclusion that appellant was sane despite his lack of contact with appellant. Moreover, the lapse in time between the shootings and the meeting between Webb and appellant further served to render the opinion testimony invalid. The testimony was both highly inflammatory and of dubious probative value. Hence, the unfair prejudice resulting from this testimony renders it inadmissible.
In a related issue, appellant contends that it was error to allow the state's rebuttal witnesses to give lay opinion testimony on his sanity without laying the proper foundation to support the opinions. Only one of the five witnesses who gave a nonexpert opinion as to appellant's sanity was actually an eyewitness to the shooting and knew appellant well enough to render such an opinion. Only Linda Garron was technically competent to make that determination. Of the other four lay witnesses who opined as to appellant's sanity, only the deputy who arrested appellant could even arguably have been capable of rendering such an opinion. The others simply did not know appellant well enough, had not observed him enough, and did not observe him close enough in time to the shooting to give competent, lay testimony as to his sanity at the time of the act.
We do not, however, hold that admission of all of this testimony is error. As this Court stated in Rivers v. State, 458 So.2d 762, 765 (Fla. 1984), "[i]t is a well established principle of law in this state that an otherwise qualified witness who is not a medical expert can testify about a person's mental condition, provided the testimony is based on personal knowledge or observation." E.g., Sealey v. State, 89 Fla. 439, 105 So. 137 (Fla. 1925); Hixon v. State, 165 So.2d 436 (Fla. 2d DCA 1964). The Rivers case, like the present case, involved the testimony of a detective who was allowed to give opinion testimony as to the defendant's sanity. The Court found that such *357 testimony was permissible if based on the witness's personal knowledge.
The Rivers case does not address what knowledge or observation of the defendant is necessary or how close in time to the events the observation must take place to render lay opinion testimony on sanity admissible. As appellant points out, if taken to an absurd extent, Rivers could be read to allow such testimony from any person who has ever encountered a defendant in public. We decline to read Rivers so expansively. A lay witness, testifying on his or her personal observation as to a defendant's sanity, must have gained this personal knowledge in a time period reasonably proximate to the events giving rise to the prosecution. Thus, the opinion testimony as to appellant's sanity could only come from those whose personal observation took place either at the shooting or in close time proximity thereto. Those lay witnesses whose opinions were based on observations occurring the next day, or sometime thereafter, should not be admitted. A nonexpert is not competent to give lay opinion testimony based on his personal observation that took place a day removed from the events giving rise to the prosecution. This is clearly the domain of experts in the field of psychiatry. Any lay opinion testimony as to the appellant's sanity must necessarily be based on observations made in close time proximity to those events upon which appellant's sanity is in question.[3]
In response to rebuttal of the insanity defense, the assistant state attorney made several comments during cross-examination of court appointed psychiatrists and during closing argument, which were intended to discredit the insanity defense as a legal defense to the charge of murder. We believe that once the legislature has made the policy decision to accept insanity as a complete defense to a crime, it is not the responsibility of the prosecutor to place that issue before the jury in the form of repeated criticism of the defense in general. Whether that criticism is in the form of cross-examination, closing argument, or any other remark to the jury, it is reversible error to place the issue of the validity of the insanity defense before the trier of fact. To do so could only helplessly confuse the jury. The insanity defense is a policy question that has plagued courts, legislatures, and governments for decades. It is unnecessary to similarly plague injuries.
The next issue raised by appellant involves the admission of certain "similar fact" evidence pursuant to the Florida Evidence Code, section 90.404(2), Florida Statutes (1981), and Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).[4] The evidence admitted includes the testimony of Linda Garron that appellant had previously engaged in alleged sexual misconduct with his two stepdaughters. This activity took place more than two years prior to the killings. The state claims that the evidence is relevant to show appellant's motive for killing his wife and stepdaughter in that he was attempting to prevent his wife from taking the stepdaughters away to avoid his improper advances.
Any analysis of the admissibility of similar fact evidence must necessarily begin with a close reading of section 90.404(2)(a), Florida Statutes (1981). That statute reads:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence *358 is relevant solely to prove bad character or propensity.

§ 90.404(2)(a) (emphasis added). See e.g., Fed.R.Evid. 404(b).
In closely examining similar fact evidence, one critical issue of concern is whether the evidence is being used to prove any relevant issue besides character. Here, the state's theory is that the evidence of the alleged misconduct is relevant to appellant's motive for the murders. The focal point of analysis is whether there is actually any similarity between the alleged misconduct and the crime for which appellant stands trial. That is, does the "similar" fact bear any logical resemblance to the charged crime. The state claims that Linda Garron's testimony that prior to the shootings the appellant touched her thigh sufficiently establishes the requisite connection between the prior bad acts and the present crime. We believe that this "connection" is far too tenuous to support the admission of the similar fact evidence. Even if there were similarities between the events, they are in no way relevant to show motive.
In Williams, the similar fact evidence involved evidence that the defendant, who was charged with rape, had previously committed the same act in precisely the same manner. Williams had hidden in the back seat of the victim's car, waited for the victim to return, and raped her. The state produced a witness who testified that Williams waited in her car and committed the identical act in the same parking lot at about the same hour as the attack on the victim. This Court allowed the evidence to be admitted under the theory that it showed Williams' plan or pattern of operation. In this case, however, the alleged sexual misconduct in no way resembles the act for which appellant was convicted. Moreover, the prior acts are far too remote in time to support any allegation that they could have provided appellant with a motive for the killings.
As such, the only possible issue for which this evidence could be used is to prove character and propensity. As the statute states, these issues are not valid grounds for the admission of similar fact evidence. A danger of unfair prejudice arises if alleged acts of sexual misconduct are put before the jury when such evidence is not relevant to prove a material issue. This danger renders the evidence inadmissible. Here, the inflammatory effect of this type of evidence played a role in the conviction of appellant.
The penalty phase, like the guilt phase of appellant's trial, contained error. During cross-examination of appellant's sister, the prosecutor was permitted to raise the point that appellant had allegedly killed somebody in Greece or Turkey. We stated in Robinson v. State, 487 So.2d 1040 (Fla. 1986), that evidence of crimes for which the defendant has not been charged with or convicted of may not be presented to the jury in an attempt to attack the witness' credibility. The state's argument that Robinson is distinguishable on the basis of the number of times the inadmissible evidence was mentioned by the prosecutor is wholly without merit. The number of times evidence is put before the jury has no bearing on its admissibility.
At closing argument of the penalty phase, the prosecutor made several remarks which, notwithstanding curative instructions, were so egregious, inflammatory, and unfairly prejudicial that a mistrial was the only proper remedy. The following remarks, when taken in their totality, justify a new penalty proceeding. The prosecutor stated:
[T]he people of the State of Florida, ladies and gentlemen, have determined that in order to deter others from walking down the streets and gunning down... .[5]
... .
[Y]ou can just imagine the pain this young girl was going through as she was laying there on the ground dying... . Imagine the anguish and the pain that Le Thi Garron felt as she was shot in the chest and drug [sic] herself from the *359 bathroom into the bedroom where she expired.[6]
... .
The law is such that when the aggravating factors outnumber the mitigating factors, then death is an appropriate penalty.[7]
... .
If Le Thi were here, she would probably argue the defendant should be punished for what he did.[8]
... .
Ladies and gentlemen, I believe at this point, I would hope at this point, that the jurors will listen to the screams and to her desires for punishment for the defendant and ask that you bring back a recommendation that will tell the people of Florida, that will deter people from permitting... .[9]
... .
[I]t is your sworn duty as you came in and became jurors to come back with a determination that the defendant should die for his actions.[10]
Following these comments the prosecutor concluded his argument at which time defense counsel moved for a mistrial based on the cumulative nature of the improper, misleading, and highly inflammatory comments. The motion was denied by the trial judge.
We have held that prosecutorial misconduct in the penalty phase must be egregious to warrant vacating the sentence and remanding for a new penalty phase proceeding. Bertolotti v. State, 476 So.2d 130, 133 (Fla. 1985) But see Teffeteller v. State, 439 So.2d 840 (Fla. 1983), cert denied, 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 754 (1984). We believe, however, that the actions of the prosecutor in this case represent an example of what constitutes egregious conduct. When comments in closing argument are intended to and do inject elements of emotion and fear into the jury's deliberations, a prosecutor has ventured far outside the scope of proper argument. These statements when taken as a whole and fully considered demonstrate the classic case of an attorney who has overstepped the bounds of zealous advocacy and entered into the forbidden zone of prosecutorial misconduct. In his determination to assure that appellant was sentenced to death, this prosecutor acted in such a way as to render the whole proceeding meaningless. While it is true that instructions to disregard the comments were given, it cannot be said that they had any impact in curbing the unfairly prejudicial effect of the prosecutorial misconduct.
This is certainly not the first time prosecutorial misconduct has been brought to our attention. In State v. Murray, 443 So.2d 955 (Fla. 1984), and again in Bertolotti v. State, 476 So.2d 130 (Fla. 1985), this Court expressed its displeasure with similar instances of prosecutorial misconduct. Such violations of the prosecutor's duty to seek justice and not merely "win" a death recommendation cannot be condoned by this Court. ABA Standards for Criminal Justice 3-5.8 (1980); 476 So.2d at 133. In Bertolotti we stated our concern:
Nonetheless, we are deeply disturbed as a Court by the continuing violations of prosecutorial duty, propriety, and restraint. We have recently addressed incidents of prosecutorial misconduct in several death penalty cases... . As a Court, we are constitutionally charged not only with appellate review but also "to regulate ... the discipline of persons admitted" to the practice of law. Art. V, § 15, Fla. Const. This Court considers this sort of prosecutorial misconduct, in *360 the face of repeated admonitions against such overreaching, to be grounds for appropriate disciplinary proceedings. It ill becomes those who represent the state in the application of its lawful penalities to themselves ignore the precepts of their profession and their office.
476 So.2d at 133 (emphasis added and in original) (citations omitted).
The Court in Bertolotti noted that under those circumstances, disciplinary proceedings, not mistrial, was the proper sanction for the prosecutorial misconduct. Nevertheless, it appears that the admonitions in Bertolotti went unheeded and that the misconduct in this case far outdistances the misconduct in Bertolotti. Thus, we believe a mistrial is the appropriate remedy here in addition to the possible penalties that disciplinary proceedings could impose upon the prosecutor.
The final point raised by appellant involves the validity of each of the four aggravating circumstances found by the trial court. The first aggravating factor, conviction of a felony involving the threat or use of violence, cannot stand due to the lack of a conviction or guilty plea. In 1974, appellant pled nolo contendere to a charge of aggravated assault. Adjudication of guilt was withheld. In McCrae v. State, 395 So.2d 1145 (Fla. 1980), cert. denied, 454 U.S. 1041, 102 S.Ct. 583, 70 L.Ed.2d 486 (1981), this Court upheld that aggravating factor because there was a guilty plea but no adjudication of guilt. In that case we recognized that a valid guilty plea should be considered a "conviction" for capital sentencing proceedings. The Court reasoned that the guilty plea is more than a confession; it is a conviction. 395 So.2d at 1154; Boykin v. Alabama, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969). In the present case, however, the prior "conviction" lacks a guilty plea. Under the McCrae analysis, the plea of guilty is an absolute condition precedent before the lack of adjudication can be considered a conviction. Here, appellant pled nolo contendere to the aggravated assault charge and received no adjudication of guilt. It does not follow from McCrae that a plea of nolo contendere amounts to either a confession of guilt or a "conviction" for purposes of capital sentencing proceedings. A nolo plea means "no contest," not "I confess." It simply means that the defendant, for whatever reason, chooses not to contest the charge. He does not plead either guilty or not guilty, and it does not function as such a plea. None of the factors which go toward evidencing a conviction are present in this case, therefore, the first aggravating factor must fail.
Similarly, the second aggravating circumstance is also invalid. The trial judge found that the offense was committed to avoid arrest based on the evidence that appellant shot Tina while she was talking on the telephone with the operator asking for the police. We have stated that when the victim of the murder is not a police officer, proof of intent to avoid arrest by murdering a possible witness must be very strong before the murder can be considered as an aggravating circumstance. Riley v. State, 366 So.2d 19, 22 (Fla. 1978), cert. denied, 459 U.S. 981, 103 S.Ct. 317, 74 L.Ed.2d 294 (1982). See White v. State, 403 So.2d 331, 338 (Fla. 1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983) (elimination of witness must be "dominant motive" behind murder where victim is not a police officer). Here, there is no proof as to the true motive for the shooting of Tina. Indeed, the motive appears unclear. The fact that Tina was on the telephone at the time of the shooting hardly infers any motive on the appellant's part. Thus, the second aggravating circumstance cannot stand.
The third aggravating factor, that the offense was especially heinous, atrocious, or cruel, has no merit. The sole evidence in support of this factor was that appellant fired at Tina from a "steady firing position." This in no way establishes that appellant's actions amounted to an atrocity.
The final aggravating factor, that the offense was committed in a cold, calculated, and premeditated manner, is also without support. There is no evidence of *361 heightened premeditation with respect to the shooting of Tina Garron. While it is true that appellant hid the gun in a towel before he shot Le Thi, he did not do so when he shot Tina. It appears the shooting of Tina was a spontaneous reaction. As the state admits in its brief, the heightened premeditation aggravating factor was intended to apply to execution or contract-style killings. This case involves a passionate, intra-family quarrel, not an organized crime or underworld killing.
In Wilson v. State, 493 So.2d 1019 (Fla. 1986), this Court stated that when the murder is a result of a heated domestic confrontation, the penalty of death is not proportionally warranted. See Ross v. State, 474 So.2d 1170 (Fla. 1985); Blair v. State, 406 So.2d 1103 (Fla. 1981). The record shows that this is clearly a case of aroused emotions occurring during a domestic dispute. While this does not excuse appellant's actions, it significantly mitigates them.
Appellant's remaining arguments[11] are without merit. Nonetheless, for the reasons stated above, we reverse both the judgment and sentence of appellant, and remand for a new trial.
It is so ordered.
McDONALD, C.J., and OVERTON, EHRLICH, BARKETT, GRIMES and KOGAN, JJ., concur.
SHAW, J., concurs in result only.
BARKETT, J., concurs specially with an opinion.
BARKETT, Justice, specially concurring.
I concur with everything in the majority opinion but note that I would not have used sanity and mental condition interchangeably as Rivers apparently did. Although I believe a lay witness can testify about his or her observations of the defendant's conduct relating to mental condition, I think it inappropriate to permit such a witness to opine on the ultimate question of sanity.
NOTES
[1] In Greenfield the court allowed testimony during the prosecution's case-in-chief from arresting officers that the defendant exercised his right to remain silent and consult with counsel. 474 U.S. at 286-87, 106 S.Ct. at 636.
[2] See State v. Clausell, 474 So.2d 1189 (Fla. 1985).
[3] In addition, witnesses who have known and observed a defendant over an extended period of time may also be competent to testify as to their nonexpert opinion on the defendant's sanity.
[4] While it is true that the trial court admitted this evidence under the auspices of Williams, and the state argues that the rule justifies that admission, this evidence is not, even under a broad interpretation of Williams, "similar fact" evidence. However, because the trial court admitted the evidence under Williams, we will discuss the relevance of the evidence in the venacular of that rule.
[5] Objections to this comment were sustained and the jury was instructed to disregard it.
[6] Under this Court's decision in Bertolotti v. State, 476 So.2d 130 (Fla. 1985), such violations of the "Golden Rule" against placing the jury in the position of the victim, and having them imagine their pain are clearly prohibited. 476 So.2d at 133.
[7] An objection was sustained on the basis that the comment is a misstatement of the law.
[8] Objections to these comments were sustained and curative instructions were given to the jury.
[9] An objection was sustained and the court instructed the jury to disregard the remark.
[10] Again, defense counsel's objections to this misstatement of the law were sustained, and the jury was instructed to disregard the comment.
[11] These arguments concern the following issues: the failure to lay the required predicate for impeaching a defense witness; the admission of rebuttal testimony of one of the appellant's former psychiatrists; the admission of 1974 psychiatric reports with no opportunity to cross-examine the doctors who prepared the reports; and penalty phase cross-examination dealing with predictions of consequences of appellant's eventual release from custody.