GLICKSTEIN, Judge,
dissenting.
In my view, appellant was improperly convicted of attempted first degree murder and simple battery upon a woman. We should reverse and remand with direction to proceed in accordance with the following *1291 statement of law and holding in Fisher v. State, 506 So.2d 1052 (Fla. 2d DCA 1987):
Ordinarily, a defendant who successfully moves for judgment of acquittal is entitled to discharge. However, acquittal by reason of insanity requires different treatment. In such a circumstance the trial judge may: “(1) discharge the defendant; (2) order outpatient treatment at a specific appropriate facility; or (3) commit the defendant to the Department of Health and Rehabilitative Services facilities for involuntary hospitalization.” State v. Vigil, 410 So.2d 528, 530 (Fla. 2d DCA 1982). See also § 916.15, Fla.Stat. (1985); Fla.R.Crim.P. 3.217. Therefore, we deem it inappropriate to direct the trial judge to discharge the defendant. Instead, we remand this case to the trial court for a determination of the proper disposition as outlined herein.
Id. at 1054.
At issue was appellant’s sanity. The prosecution’s case in chief raised the question of appellant’s sanity by the testimony of the victim as to appellant’s bizarre conduct. The state relied upon the victim, as well as the testimony of the officer who took appellant’s statement the following day, to establish the elements of the offense. The officer’s observations of appellant’s behavior on the following day would have been inadmissible upon the sanity issue because of Garron v. State, 528 So.2d 353 (Fla.1988). The testimony of the victim and of the officer clearly established the elements for which appellant was convicted, absent the issue of his sanity.
The victim testified that she was on her patio when appellant grabbed her and, while maintaining a choke hold, took her into her home as she struggled. Once inside a dressing room, appellant ripped off her bathing suit, lay upon her, and threatened to rape and kill her as he beat her about the face and chest. In the midst of all this, appellant, suddenly and for no apparent reason, got up, went to the phone and placed a call. According to the victim, when she heard her door chimes, she felt safe enough to rise from the dressing room floor and pick up the dangling telephone receiver, located in the kitchen. The voice on the other end of the line was appellant’s Ohio therapist, to whom the victim spoke. At no time did the victim state her views on the issue of appellant’s sanity.
Officer Smallwood testified that on July 15, 1986, the day after the incident, appellant identified himself as Ricky Davidson, although he later revealed his name was Melvin Miller. Appellant said he grabbed the victim in anger; described how he threatened to rape and kill her because she would not keep quiet; said her inability to remain silent caused appellant to tear her swimsuit for use as a gag; said that he struck her because she continued to yell and that he finally began choking her. He said he became very confused and did not know what to do, so he called his therapist. Although appellant wanted to tie Ms. Davis with the telephone cord, he obeyed his therapist’s order to leave the residence.
The therapist, Ms. Goodwin, testified that she received the telephone call from appellant, who first told her that he had hostages; and that he was going to kill them. He seemed very distraught, sounded very confused, excited, angry — and perhaps even hyperventilating — and was crying some. Although the therapist had seen appellant from 1984 to 1986, first daily, then weekly, then biweekly, the phone call was the first time he had ever been incoherent. One of the most telling statements she made was during redirect:
Q. When he called you from the house, do you think he knew right from wrong?
A. No, I don’t think he knew right from wrong. I think that he was confused and I think that later on he knew, he knew there was something wrong, but he didn’t know what.
I don’t think that he knew the difference between right and wrong. I think in the beginning he was real confused.
I think something happened and he called me. This man was in the middle of a crime and he stopped in the middle of this crime to call me to ask me what should he do.
*1292 Appellant telephoned the therapist about fifteen or twenty minutes later. Again on redirect, the therapist testified:
Q. The second time he called you when he told you he wouldn’t be taken alive, did he talk to you about suicide?
A. Uh-huh.
Q. Did he talk to you about his father?
A. His father, and he reiterated about his father and how he died without being able to see him and that the system was the reason for his father’s death, the reason for his predicament and his whole life.
Q. Was this near the date of his father’s death?
A. I think his father died on July 19th, if I can recall, and this was July 14th.
The therapist had no way of knowing that appellant had been walking through the neighborhood in a bathing suit. There is no evidence that he ever took it off during the attack on the victim.
The trial court appointed two experts to examine appellant. Dr. Bortnick’s expert opinion supported that of Ms. Goodwin. He testified that appellant was a paranoid schizophrenic suffering from hallucinations and delusions; that his disease manifested itself in an episodic nature at unpredictable times; and that he could appear normal until some event triggered his illness. Based upon a review of the incident reports, hospital records and two interviews with appellant, Dr. Bortnick determined that appellant could not distinguish right from wrong on July 14, 1986; thus he was legally insane.
Dr. Fueyo confirmed Dr. Bortnick’s diagnosis of appellant’s disorder. He testified that appellant did not know the consequences of his actions. While Dr. Fueyo acknowledged on cross-examination that appellant understood choking the victim could result in her death, appellant did not know “what was going to happen after-wards.” In essence, even though appellant could comprehend concrete thought, he could not appreciate anything other than acting out his own desires.
Fisher v. State stated the pertinent law as follows:
In Florida a person is presumed sane, and in a criminal prosecution, the burden is on the defendant to present evidence of insanity. Preston v. State, 444 So.2d 939 (Fla.1984). Where the defendant introduces evidence sufficient to present a reasonable doubt of sanity, the presumption of sanity vanishes and the accused’s sanity must be proven beyond a reasonable doubt by the state. Yohn v. State, 476 So.2d 123 (Fla.1985); Walker v. State, 479 So.2d 274 (Fla. 2d DCA 1985). If the state does not overcome the reasonable doubt, the defendant is entitled to acquittal. Sirianni v. State, 411 So.2d 198 (Fla. 5th DCA 1981).
In Florida, the test for insanity as a defense to a criminal charge is whether at the time of the offense the defendant had a mental infirmity, disease, or defect and, as a result, did not know what he was doing or did not know what he was doing was wrong. State v. McMahon, 485 So.2d 884 (Fla. 2d DCA 1986). This is a modified version of the M’Naghten Rule. See Wheeler v. State, 344 So.2d 244 (Fla.1977).
Id. at 1054 (emphasis added).
In Yohn v. State, 476 So.2d 123 (Fla. 1985), the Florida Supreme Court spoke similarly:
It is the law of Florida that all men are presumed sane, but where there is testimony of insanity sufficient to present a reasonable doubt of sanity in the minds of the jurors the presumption vanishes and the sanity of the accused must be proved by the prosecution as any other element of the offense, beyond a reasonable doubt.
Id. at 126 (quoting Holmes v. State, 374 So.2d 944 (Fla.1979), cert. denied, 446 U.S. 913, 100 S.Ct. 1845, 64 L.Ed.2d 267 (1980) (emphasis in original).