HAZOURI, J.
Leotis Lester, Jr., appeals from his conviction for first degree murder and attempted robbery of Mark Thibault. Lester raises two points on appeal. We affirm in all respects and choose to address his second point on appeal that the trial court erred in admitting into evidence an out-of-court identification made by the deceased victim under the dying declaration exception of the hearsay rule.
Prior to Thibault’s death, Boynton Beach Police Department detective Christopher Crawford, who had been monitoring Thibault’s condition, met with Thibault on January 26, 2007, in his hospital room to show him a photo lineup. Thibault could not speak, but blinked once for no and twice for yes when asked about each photo. When Detective Crawford showed him Lester’s picture and asked him if he was the person who shot him, Thibault blinked twice. He blinked once for all other pictures.
Lester argues that Detective Crawford’s testimony as to Thibault’s identification of Lester in the photo lineup was inadmissible hearsay because it did not meet the requirements of the dying declaration exception to the hearsay rule. He argues that there was no evidence that Thibault believed his death was imminent or that he had no hope of recovery. We disagree.
Dr. Eugenio Rodriguez treated Thibault when he was brought to the hospital on January 20, 2007. He had a gunshot wound to the left side of his neck, had been intubated, and was in critical condition. The bullet went in though his carotid artery and into the spinal cord, transecting them both. His brain had stopped receiving blood, causing injury and severe damage because of the loss of oxygen. He had a severe spinal cord injury and was a quadriplegic. He needed assistance in breathing. Surgery was necessary for the massive bleeding. Rodriguez opined that someone with that injury would most probably die in the first three days, or if he survived, it would be in a vegetative state.
Dr. Adel Monsor began treating Thi-bault on January 24, 2007, in the trauma intensive care unit. Thibault was totally dependent on the ventilator and had a tracheostomy. Thibault had also had a stroke of the left hemisphere of the brain. He could not speak, but Monsor communicated with him through eye blinks and head nods. Thibault was appropriately responsive. The gunshot wound disconnected the phrenic nerves which caused his diaphragm to not work. He was unable to breathe on his own. The damage to the spinal cord and the brain were not repairable, nor would they regenerate. After Monsor saw Thibault the first day, it was his prognosis that Thibault would not survive his hospitalization. On that first day he explained to Thibault the severity of his injuries. He did not specifically tell Thi- *954 bault that he was not likely to survive because that would create a barrier between him and Thibault.
On January 25, 2007, Thibault developed pneumonia and a staph infection. On January 26, 2007, Thibault had a fever, was anemic, and a neck infection started to evolve. Dr. Monsor told Thibault he was deteriorating. Thibault was more comfortable with him by that time. He told Thi-bault he was developing more complications and getting sicker, which Thibault acknowledged. On January 29, 2007, he specifically told Thibault his prognosis was death. Thibault agreed to a DNR.
After the doctors’ testimony, there was argument on the issue of dying declaration. Lester argued that there was no proof that Thibault had a state of mind at the time of the ID that appreciated the near and inevitable approach of death and was without any hope of recovery. The court found:
The Court does, however, after hearing the medical testimony presented, as well as the other evidence, find that Mr. Thi-bault did at the time of this utterance and that being the testimony would be the blinking and the — when he was shown various pictures, did in fact, know his death was immanent [sic] and inevitable. The Court does find that based on the evidence that he did entertain no hope whatsoever of recovery.
The Court does believe that this is a dying declaration and does qualify under the evidence code and therefore I’m going [sic] grant the State’s motion to admit the evidence.
Section 90.804(2)(b), Florida Statutes (2007), provides an exception to the hearsay rule for “a statement made by a declarant while reasonably believing that his or her death was imminent, concerning the physical cause or instrumentalities of what the declarant believed to be impending death or the circumstances surrounding impending death.” In Hayward v. State, 24 So.3d 17 (Fla.2009), the supreme court held:
Pursuant to section 90.804(2)(b), Florida Statutes (2007), and this Court’s prior rulings, the deceased must have known and “appreciated his condition as being that of an approach to certain and immediate death,” although it is not necessary that the declarant “make express utterances” that he would never recover. Henry v. State, 613 So.2d 429, 431 (Fla. 1992) (quoting Lester v. State, 37 Fla. 382, 20 So. 232, 233 (1896)). “Rather, the court should satisfy itself, on the totality of the circumstances,” that the deceased knew he was dying. Id. (quoting Lester, 20 So. at 233). This Court has said the “absence of all hope of recovery, and appreciation by the de-clarant of his speedy and inevitable death, are a preliminary foundation that must always be laid to make such declarations admissible.” McRane v. State, 142 Fla. 240, 194 So. 632, 636 (1940) (quoting Lester, 20 So. at 233). Further, the declarant must not have merely considered himself in imminent danger, but he must have “believed he was without hope of recovery.” Dixon v. State, 13 Fla. 636, 640 (1869); see also Morris v. State, 100 Fla. 850, 130 So. 582, 584 (1930) (“[The declarant] knew unquestionably, that he had been mortally wounded.”).
Id. at 30-31. Although the admissibility of evidence is generally reviewed for abuse of discretion, “whether a proper and sufficient predicate has been established for the admission of a statement under the dying declaration hearsay exception is a mixed question of law and fact that is reviewed under a ‘clearly erroneous’ standard.” Jones v. State, 36 So.3d 903, 908 (Fla. 4th DCA 2010) (citations omitted).
*955 In Labon v. State, 868 So.2d 1222 (Fla. 3d DCA 2004), the victim was shot and admitted to the hospital for a penetrating wound to the head, neck, and torso. A detective came to the trauma center and spoke with the victim shortly before his surgery and while he was in critical care. The victim was in pain, but able to communicate. He had lost sensation to his legs, had IV tubes draining blood from him and he was going into emergency surgery. He told the detective that the defendant shot him. He died eleven days later from complications of the gunshot wound to the neck. The district court affirmed the admission of this dying declaration by the trial court holding:
A declarant need not make express utterances regarding knowledge of impending death in order for the statement to be admitted as a dying declaration. However, the court must be satisfied that the deceased knew and appreciated the severity of his or her condition as one where he or she was facing imminent death.
Id. at 1223 (internal citations omitted).
In Williams v. State, 967 So.2d 735 (Fla. 2007), the victim was stabbed in the back and in the heart, told the 911 operator that she was dying, and made statements as to who stabbed her. As well, she made statements to a detective after she regained consciousness from general anesthesia and was expressing her fear of dying. The court further noted:
Also relevant to [her] perception of her imminent death following her surgery is a recognition that she was attached to medical machinery, including a respirator, a heart monitor, and two chest tubes, of which she was clearly aware. Despite supportive attempts by hospital personnel, there is no clear evidence from the record that [she] believed she had any hope of recovery. Under these facts, we conclude that the admission of the hospital statements as dying declarations was not clearly erroneous.
Id. at 749.
As indicated from the testimony of the doctors, by the date of the statement given by Thibault, he was completely paralyzed below the neck, could not breathe on his own, had developed pneumonia and a staph infection, and had been told by the doctor of his condition and by January 26, 2007, that his condition was deteriorating. He was aware of what was happening to him because the doctor could speak to him and he would respond appropriately with the eye blinks. He was always in the intensive care unit. From these circumstances, we conclude that the trial court’s admission of Thibault’s identification as a dying declaration was not clearly erroneous.

Affirmed.

MAY, C.J., and CONNER, J., concur.