837 So.2d 940 (2003)
Noel DOORBAL, Appellant,
v.
STATE of Florida, Appellee.
No. SC93988.
Supreme Court of Florida.
January 30, 2003.
*944 Scott W. Sakin, Special Assistant Public Defender, Miami, for Appellant.
Charles J. Crist, Jr., Attorney General, and Sandra S. Jaggard, Assistant Attorney General, Miami, for Appellee.

ON REHEARING
PER CURIAM.
The opinion issued in this case on October 10, 2002, is withdrawn, and the following opinion is substituted in its place. Noel Doorbal (Doorbal) appeals his convictions of first-degree murder and his sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the first-degree murder convictions and the sentences of death. We also affirm all of Doorbal's other convictions and sentences.

FACTS
Doorbal's case has intricate facts involving many persons. The criminal charges in this case are related to the abduction, extortion, and attempted murder of Marcelo (Marc) Schiller, and the abduction, attempted extortion, and murders of Frank Griga and Krisztina Furton.

Abduction, Extortion, and Attempted Murder of Marc Schiller[1]
In the early 1990's, Marc Schiller, a wealthy Miami businessman, owned an accounting firm, Dadima Corporation. His business expanded into providing services that were reimbursed by Medicare. Schiller hired Jorge Delgado[2] to assist with his business pursuits, and the two became close friends. Delgado often visited Schiller's home for both business and social reasons. Eventually, Schiller sold the Medicare-related portion of his business to Delgado, along with the name "Dadima Corporation." Schiller selected a new name for his accounting business of "D.J. & Associates." After selling the Medicare portion of his business to Delgado, Schiller continued to perform consulting work for Delgado and Dadima Corporation.[3]
Delgado exercised at Sun Gym in the Miami area, where Doorbal's codefendant, Daniel Lugo, was employed.[4] Delgado and Lugo became good friends, and at times Lugo would even accompany Delgado on visits to Schiller's home. Through this association, Delgado also came to know Doorbal. Schiller viewed Lugo as an unsavory character, and expressed his concern to Delgado.
By 1994, a rift had developed between Schiller and Delgado. Schiller had been questioning Delgado's accounting practices with regard to Dadima Corporation, and he was also concerned with transactions involving some bank accounts. During a meeting with a banker at a local restaurant, the conflict expanded as Delgado refused *945 to respond to Schiller's questions and became very angry. Thereafter, Schiller and Delgado severed all business ties and on the advice of Lugo, Delgado hired John Mese to be his replacement accountant.[5]
In the September-October 1994 time frame, Lugo advised Delgado of his belief that Schiller had been cheating Delgado with regard to the billing operations that Schiller had been performing for Delgado and the Medicare business. Delgado testified that Lugo showed him documentation which purported to prove that Schiller had been cheating Delgado. Lugo informed Delgado that Schiller had also been cheating Lugo. When Delgado confronted Schiller with allegations of cheating in the billing operation, Schiller flatly denied the accusations.
Lugo enlisted Doorbal and several other individuals in a plot to kidnap Schiller, with the goal of forcing him to sign over assets equivalent in value to that which Delgado and Lugo believed to be owed to them.[6] Delgado asked Lugo to do whatever was necessary to recover the value he believed Schiller owed to both of them, but Delgado expressed a desire that he not be personally involved in any of the scheming. Nevertheless, Delgado did become deeply involved in a plan to kidnap Schiller. He informed Lugo, Doorbal, and two men recruited by Lugo from Sun Gym (Stevenson Pierre and Carl Weekes) of details concerning Schiller's home,[7] family, cars, and personal habits. Doorbal and others recruited for the plot were promised that they would share in the bounty taken from Schiller. The group agreed to secretly observe Schiller to learn his daily routine to implement the plan. Testimony at trial established that Lugo was the unquestioned mastermind of the plan to abduct and extort money from Schiller. Stevenson Pierre observed Lugo's role to be that of a general in a military operation. Pierre described Doorbal as "[s]econd in command." The group eventually purchased or otherwise procured handcuffs, walkie-talkies, and a stun gun (among other items) to aid in the execution of the abduction plan.
After several failed attempts to locate and capture Schiller, on November 15, 1994, the group finally succeeded in abducting him from the parking lot of the delicatessen restaurant he owned in the Miami area. Doorbal and Weekes grabbed Schiller, and Weekes proceeded to subdue Schiller by shocking him with the stun gun. Another participant, Sanchez, assisted Doorbal and Weekes in forcing Schiller into a waiting van. Inside the van, Schiller was handcuffed and duct tape was placed over his eyes. A gun was placed at Schiller's head, and his wallet and jewelry removed as the van proceeded to a warehouse that Delgado had previously rented. Schiller received additional shocks with the stun gun and was kicked repeatedly as the plan unfolded. Lugo arrived at the warehouse shortly after *946 Doorbal and the others arrived with Schiller.
Schiller's captors demanded a list of his assets which Schiller initially refused to provide. The refusal resulted in his being slapped, shocked with the stun gun, and beaten with a firearm. Weekes questioned Schiller about his assets, based on information provided by Lugo and Delgado. Schiller testified that after he again refused to provide the requested information, he was told that he was going to engage in a game of Russian Roulette. A gun was placed to his head, the cylinder was turned, and the trigger was pulled twice but the weapon did not fire.[8] Schiller's captors proceeded to read a highly accurate list of his assets to him, demanding that he corroborate what they already knew, and that he add to the list assets of which they were not aware. The captors also apprised Schiller that they knew the alarm code for entry into his home. Because his assailants possessed such detailed knowledge of his assets and his home, Schiller surmised that Delgado must have been involved in the plot. Schiller also came to recognize Lugo's voice, despite Lugo's efforts to disguise his identity. Schiller testified that Lugo's speech often had a very recognizable lisp-like trait.
The captors further threatened that if Schiller did not cooperate, his wife and children would also be abducted and his wife raped in his presence. Schiller was eventually compelled to agree to cooperate, but only if his wife and children were allowed to leave the country unharmed. In the ensuing days, Schiller began signing over his assets, including a quitclaim deed for his home, various documents granting access to his checking,[9] savings, and IRA accounts, and authorization for changing the beneficiary of his million-dollar insurance policies.[10]
During Schiller's captivity, Doorbal and Lugo entered Schiller's home and removed many furnishings and other items. Lugo, Delgado, and Weekes also began charging thousands of dollars to Schiller's credit cards. Money from the safe in Schiller's home was divided among Doorbal, Weekes, and Pierre. Three weeks into Schiller's captivity, Doorbal and Delgado convinced Lugo that Schiller must be killed, because he had likely surmised the identities of some, if not all, of his captors. A plan was then developed to kill Schiller but to give the appearance that Schiller's death resulted from the operation of his automobile under the influence of alcohol. In the fourth week, Schiller was forced to consume large amounts of alcohol to make him intoxicated. Lugo drove Schiller's Toyota 4-Runner into a utility pole on a Miami-area street to create the impression that Schiller had been involved in an accident resulting from driving while intoxicated. Doorbal and Weekes also participated in this episode and Schiller was placed in the front seat of the 4-Runner after it had been driven into the pole. Lugo and Doorbal then poured gasoline on the vehicle and set it ablaze. Lugo, Doorbal, and Weekes had planned to exit the scene in another vehicle that Weekes had driven to *947 the scene, but they noticed that Schiller had somehow managed to exit his burning vehicle, and was staggering in the roadway. Schiller had not been securely bound in the seat of the vehicle. At the urging of Lugo and Doorbal, Weekes used his vehicle to strike and run over Schiller. The three left the scene of these events believing they had killed Schiller. Lugo later instructed Stevenson Pierre to drive by the scene of their handiwork to determine if there was any police activity.
Miraculously, Schiller survived this attempt to take his life and he was rescued. He remembered awakening in a Miami hospital with a broken pelvis, ruptured bladder, bruises and burns, and temporary paralysis. Lugo and the others eventually learned that Schiller had survived, so they visited the hospital where they thought Schiller was recuperating, with a plan to suffocate him as he lay in his hospital bed. Unknown to Lugo and the others, based upon a well-founded fear for his safety, Schiller had already arranged to be airlifted to a New York hospital to complete his recuperation. Lugo, Doorbal, and some of the other captors proceeded to empty Schiller's home of the remaining furnishings and valuables. A black leather couch and computer equipment were among the articles pilfered.
Schiller's testimony at trial included not only a description of the events surrounding his abduction and captivity, but also testimony as to the assets that had been extorted from him and his attempts to recover those assets. He also stated that while he signed an agreement with Lugo and Doorbal, indicating that the events surrounding his "abduction" were actually the result of a failed business deal, he had always intended to report the incident to the police.[11] It was his belief that signing the agreement was an expeditious way to recover as much of the value of the assets that had been extorted from him as possible. Schiller further testified that he never willingly gave any of his assets to Lugo, Doorbal, Mese, Torres, or anyone associated with them. He noted that the quitclaim deed to the home that he and his wife owned was forged, because on the date indicated for his wife's purported signature, she was actually in South America.
Schiller identified several items of property that belonged to him or his wife which police found in Lugo's possession. Among the items were computer equipment, furniture, and keys to a BMW automobile.[12] He also stated that drafts on his checking account, which were payable to John Mese or to entities related to Sun Gym, must have been those signed by him when he was blindfolded during his captivity because he never willingly signed the drafts.[13] A forensic accountant confirmed that after an extensive review of records pertaining to corporations and accounts controlled by Lugo, Doorbal, or Mese, it was clear that money and assets formerly in Schiller's control had been laundered through these methods.[14]

*948 Abduction, Attempted Extortion, and Murders of Frank Griga and Krisztina Furton[15]
Frank Griga was also a wealthy Miami-area businessman, who accumulated much of his fortune from "900" lines in the telephone industry. He and his girlfriend, Krisztina Furton, were both of Hungarian heritage. Doorbal's girlfriend at the time provided information to him about Griga. Doorbal was quickly enthralled when shown a picture of a yellow Lamborghini owned by Griga and when he learned of Griga's enormous wealth. Doorbal determined that Griga would be a prime target for kidnaping and extortion, and he soon convinced Lugo to participate in the crime with him. Delgado was aware that Lugo and Doorbal intended to kidnap and extort assets from a rich "Hungarian couple." Lugo was a full participant in the plot and he even told his girlfriend, Sabina Petrescu, that he intended to kidnap a Hungarian who drove a yellow Lamborghini or Ferrari. Lugo also fabricated an identity, which he related to Petrescu, that he worked for the Central Intelligence Agency (CIA), and that Doorbal was a killer who assisted him in his CIA missions. Petrescu testified that Lugo and Doorbal had at their disposal a suitcase with handcuffs and syringes[16] to use in the kidnaping.
Through an intermediary, Lugo and Doorbal arranged a business meeting with Griga to discuss Griga's interest in investing in phone lines in India. The Indian investment scheme was totally bogus and designed as a means for Lugo and Doorbal to ingratiate themselves with Griga and to gain his confidence. At the first meeting, Griga indicated his lack of interest but Lugo and Doorbal persisted.
In May 1995, Lugo and Doorbal gathered the suitcase containing handcuffs and syringes and made another visit to Griga's home, under the guise of presenting a computer to him as a gift.[17] Lugo and Doorbal each had a concealed firearm during this visit as they intended to execute the abduction plan at this time. This first attempt was aborted after only a fifteen-minute stay. Doorbal was irate that Lugo had not followed through with the abduction, but was placated with the news that Lugo had arranged another meeting with Griga for later that day.
When Lugo and Doorbal returned to Griga's home on May 24, 1995, they had concocted the scheme of inviting Griga and Furton to dinner, with the further goal of luring them to Doorbal's apartment, where the abduction and extortion would begin.[18] Between 10 and 10:30 p.m.,[19] Judi Bartusz, a friend and neighbor of Griga's, saw Lugo and Doorbal leave Griga's home in a gold Mercedes, while Griga and Furton left in the Lamborghini.[20]
*949 On May 25, Delgado met Lugo and Doorbal at Doorbal's apartment. Lugo informed him that Griga was already dead: Doorbal had killed Griga after the two became involved in a scuffle in and around the downstairs computer room in Doorbal's apartment.[21] Griga's body had been placed in a bathtub in Doorbal's apartment. Lugo related that when Furton had heard the scuffling between Doorbal and Griga, she rose from her seat in the living room and began to scream when she realized that Griga had been seriously injured. Lugo restrained her and subdued her with an injection of Rompun. Lugo expressed his anger toward Doorbal for having killed Griga before the extortion plan had been completed.
Lugo and Doorbal then turned their focus toward Furton. They suspected that she knew the code to enter Griga's home. Knowledge of the code would allow Lugo and Doorbal to enter Griga's home with the hope of gaining access to valuables and, most importantly, to bank account information for access to much of his wealth. Doorbal carried Furton down the stairs from the second floor of the apartment. Furton was barely clad, wearing only the red leather jacket that she had worn when she left Griga's home the night before and a hood covered her head. Not long after Doorbal placed Furton near the bottom of the stairs, although handcuffed, she began screaming for Griga. At Lugo's direction, Doorbal injected Furton with additional amounts of horse tranquilizer, causing her to scream again. Lugo and Doorbal then questioned Furton about the security code for Griga's home. Eventually, Furton refused to answer more questions. Doorbal injected her yet again with additional horse tranquilizer. Delgado testified that at this point, corrections officer John Raimondo arrived to "take care of the problem." Lugo informed Delgado that Raimondo had been solicited to kill Furton and to dispose of her body along with Griga's, but Raimondo did neither. He left Doorbal's apartment, referring to Lugo and Doorbal as "amateurs."
Armed with what he believed to be the access code for Griga's home security, Lugo took Petrescu to attempt entry while Doorbal and Delgado stayed behind. After failing to gain access to Griga's home, Lugo called Doorbal on his cellular phone. As the two talked, Petrescu heard Doorbal say, "the bitch is cold," which she believed was Doorbal's indication that Furton was dead.[22] Lugo returned to Doorbal's apartment, carrying some mail he had taken from Griga's mailbox. Lugo instructed *950 Delgado to return home, but to bring a truck to Doorbal's apartment the next morning.
When Delgado arrived with the truck on the morning of May 26, he noticed that Griga's body had been placed in a black leather couch that had been removed from the home of Marc Schiller.[23] Furton's body was placed in a transfer box and the couch, along with the transfer box, was loaded onto the truck. Neither Griga's nor Furton's body had been dismembered at this point.
Lugo, Doorbal, and Delgado proceeded with the bodies to a Hialeah warehouse. Delgado noticed a yellow Lamborghini stored there.[24] He served as a lookout while Lugo and Doorbal went to purchase items including a chain saw, hatchet, knives, buckets, flint (for igniting a fire), fire extinguisher, and a mask respirator.[25] When they returned, Lugo and Doorbal began dismembering the bodies of Griga and Furton. They used both the chain saw and the hatchet.[26]
Doorbal received a message on his pager and had to leave the warehouse, so Delgado drove him to his apartment. When Delgado returned to the warehouse, Lugo was attempting to burn the heads, hands, and feet of Griga and Furton in a metal drum. This attempt was largely unsuccessful and resulted in such a large amount of smoke that the fire extinguisher was used to smother the fire. Lugo and Delgado next went to Doorbal's apartment to remove everything, including the blood-stained carpeting, from the area where Doorbal and Griga had struggled. The items removed also included computer equipment stained with Griga's blood. The items were placed in the storage area of Lugo's apartment.[27]
By May 27, 1995, Lugo had left on a trip to the Bahamas, in an attempt to access money that Griga had deposited in bank accounts there. His efforts were unsuccessful and he returned to Miami. On May 28, 1995, Lugo, Doorbal, and Mario *951 Gray[28] disposed of the torsos and limbs of Griga and Furton. Lugo subsequently fled on a second trip to the Bahamas, where he was captured in early June 1995.[29] He was apprehended in part due to information supplied to the police by his girlfriend, Sabina Petrescu. After Doorbal's apprehension, he, like Lugo, faced a multitude of serious criminal charges, including first-degree murder (two counts), attempted first-degree murder, racketeering, kidnaping (two counts), and armed kidnaping.
At trial, the State presented more than ninety witnesses. Doorbal presented no witnesses or evidence on his behalf during the guilt-innocence phase. The trial judge denied Doorbal's motion for judgment of acquittal. The jury convicted Doorbal on all counts with which he was charged[30] and the trial court adjudicated him guilty on all counts.
The State presented only victim impact evidence in the penalty phase. Doorbal presented several witnesses who testified concerning his docile demeanor or his ability to be a good friend or employee. Doorbal's half-sister and grandmother testified that Doorbal's mother was 13 years old when she conceived him, and that she typically neglected him. Doorbal's grandmother further testified concerning an incident of Doorbal's abuse at the hands of his mother, but on cross-examination admitted that she was unclear regarding some of the details. One of Doorbal's friends testified that Doorbal changed once he met Lugo, and that he became much more interested in material things.
The jury recommended by an eight-to-four vote that the trial court impose a sentence of death for each murder. The circuit judge accepted the jury's recommendation and imposed sentences of death against Doorbal for the murders of both Griga and Furton. The trial court ordered that each death sentence would run consecutively to the other, and that the sentences for noncapital crimes would run consecutively to each other and to the sentences of death. In his sentencing order, the trial judge found a total of six aggravators: that Doorbal had been convicted of a prior violent felony; that the murders were committed to avoid arrest, for pecuniary gain, and in the course of a kidnaping; and that they were cold, calculated, and premeditated (CCP), and heinous, *952 atrocious, or cruel (HAC). All but HAC applied to both murders. The court found that the HAC aggravating factor applied to the Furton murder only. Each aggravator was accorded great weight. The trial judge did not find any statutory mitigators, but did find six nonstatutory mitigators: that Doorbal had a difficult childhood, was a hard-working and loyal employee, was a loyal friend and positive influence on others, had religious devotion and the ability to help others with religious beliefs, exhibited appropriate courtroom behavior, and that life imprisonment would remove the menace to society. Each nonstatutory mitigator was accorded little weight. This direct appeal followed.

ANALYSIS

GUILT-INNOCENCE PHASE

Probable Cause for Search Warrants
Doorbal contends that warrants employed by police to search his apartment, home, and vehicle (a Nissan 300ZX) were not supported by probable cause and, therefore, the State used evidence[31] obtained in violation of the Fourth Amendment[32] to convict him. Doorbal particularly focuses on the initial search warrant issued by the trial judge, and on the trial judge's denial of his pretrial motion to suppress evidence obtained pursuant to the initial and subsequent search warrants.
In Terry v. State, 668 So.2d 954, 958 (Fla.1996), we stated:
A trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling.
The United States Supreme Court has stated:
Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference accorded to warrants....
Illinois v. Gates, 462 U.S. 213, 232 n. 10, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)). The existence of probable cause is not susceptible to formulaic determination. See id. at 230-39, 103 S.Ct. 2317. Rather, it is the "probability, and not a prima facie showing, of criminal activity [that] is the *953 standard of probable cause." Id. at 235, 103 S.Ct. 2317 (quoting Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)); see also Schmitt v. State, 590 So.2d 404, 409 (Fla.1991) ("As long as the neutral magistrate has a substantial basis for concluding that a search would uncover evidence of wrongdoing, the requirement of probable cause is satisfied."). A judge considering a request for a search warrant must consider the totality of the circumstances included within the four corners of the affidavits presented to him or her. See Illinois v. Gates, 462 U.S. at 230-31, 103 S.Ct. 2317.
The initial search warrant was based on a supporting affidavit submitted by Metro-Dade police detective Salvatore Garafalo. Garafalo and personnel from other Miami-area police agencies had been investigating the attempted murder of Marc Schiller along with the murders of Frank Griga and Krisztina Furton. The affidavit detailed the information that police had received from Schiller, who described how he knew that Lugo and Delgado were involved in his abduction. It also indicated that Schiller's neighbor, Manuel Salgar, informed police that Lugo was frequently accompanied on visits inside Schiller's home (during the time that Schiller was being held hostage) by a dark-skinned male who drove a Nissan 300ZX automobile. Based on information from Schiller, police came to suspect that during these visits Doorbal, Lugo, and others removed valuables and other possessions belonging to Schiller. Vehicle registration records showed that a white Nissan 300ZX automobile was registered to Doorbal. Moreover, police discovered that Doorbal worked as a trainer at Sun Gym. Codefendant John Mese was a principal in Sun Gym, and had notarized a quitclaim deed which putatively transferred ownership of Schiller's home to Lugo's ex-wife, Lillian Torres. Police became suspicious about the quitclaim transaction when Schiller informed them that on the date that his wife's purported signature was affixed to the quitclaim deed, there was no question that she was in South America because she had gone there with their children while Schiller was being held captive.[33] Evidence existed that Doorbal, Lugo, and Delgado, along with others, had extorted at least $1 million from Schiller. Moreover, police discovered that during the time frame of their investigation into the attempted murder of Schiller and the murders of Griga and Furton, Doorbal had purchased a home for $150,000 in cash.
The supporting affidavit also indicated that police were aware that Griga and Furton had been missing since the evening of May 24, 1995. Judi Bartusz, a friend and neighbor of Griga's, informed police that she saw both Doorbal and Lugo in the company of Griga and Furton on the evening of May 24.[34] Griga informed Bartusz that the four were going to a Miami Lakes restaurant for dinner. Doorbal and Lugo left in a gold Mercedes, while Griga and Furton left in Griga's yellow Lamborghini. When Bartusz later noticed that Griga's yellow Lamborghini was missing from his home,[35] she went to the restaurant and noticed that a gold Mercedes was still *954 parked there, but not Griga's yellow Lamborghini. Investigation by police indicated that the gold Mercedes was registered to Delgado, and that Lugo was frequently seen driving the vehicle.
When we consider the totality of the circumstances which faced the trial court in its decision as to whether probable cause existed to justify the issuance of a search warrant in Doorbal's case, the trial court did not err in issuing the warrant or in denying Doorbal's motion to suppress. Taken as a whole, the above circumstances provide probable cause to justify issuance of a warrant to search Doorbal's automobile, apartment, and home. Moreover, the cases on which Doorbal relies are distinguishable. In Glass v. State, 604 So.2d 5 (Fla. 4th DCA 1992), the only purported indicia of probable cause to search a defendant's home for gambling-related activity were conclusory allegations that the home was being used for gambling purposes, and that the defendant had been seen on an unspecified day counting money in the home. The facts in the instant case present a picture of far greater culpability and involvement. In Getreu v. State, 578 So.2d 412 (Fla. 2d DCA 1991), the warrant in question was completely lacking in specificity as to the drug activity alleged to have taken place in the residence in question. Conversely, in Doorbal's case the supporting affidavit not only placed Doorbal and Lugo in the company of Griga and Furton very near to the time of their disappearance, but also provided sufficient links to Doorbal's probable association with Lugo and Mese, who were clearly alleged to have been involved in activities related to the extortion of Schiller. Thus, a "common sense" determination leads to the conclusion that the trial court did not err in concluding there was a probability that evidence related to the crimes against Schiller, Griga, and Furton would be found in Doorbal's automobile, apartment, and home. See Illinois v. Gates, 462 U.S. at 230-31, 103 S.Ct. 2317. Given "the great deference ... accord[ed][to] the trial court's probable cause determination," Terry, 668 So.2d at 959, we conclude that Doorbal is entitled to no relief from the denial of his motion to suppress.[36]

Improper Character Evidence
Doorbal next contends that harmful error occurred when various witnesses for the State made statements whose only purpose was to establish Doorbal's propensity to commit bad acts or to highlight Doorbal's bad character. Doorbal further notes that because he did not testify in his own defense, the issue of his character was never at issue in his trial. Doorbal fails to mention, however, that he did not contemporaneously object to any of the statements he now attempts to question.[37] We can therefore analyze the comments only under the fundamental error doctrine, which requires that an offending comment "reach[ ] down into the validity of the trial itself to the extent that a verdict of guilty or jury recommendation *955 of death could not have been obtained without the assistance of the alleged error." McDonald v. State, 743 So.2d 501, 505 (Fla.1999) (quoting Urbin v. State, 714 So.2d 411, 418 n. 8 (1998)); see also Chandler v. State, 702 So.2d 186, 191 n. 5 (Fla. 1997) (describing fundamental error as error which is "so prejudicial as to vitiate the entire trial"). We determine that no fundamental error occurred to warrant relief.
The first comments challenged by Doorbal are those made by Mario Sanchez, who claimed to have had a stormy association with Doorbal. Sanchez participated in the abduction of Marc Schiller by assisting Doorbal in forcing Schiller into the waiting van in the parking lot of Schiller's restaurant. At trial, Sanchez testified that he once heard Doorbal say to another weightlifter at Sun Gym:
[W]hen I get mad I'll do anything. I'll cutI'll start up a chain saw and cut somebody up just to see the blood spurting.... I'll go into a house and tie everybody up, grandmother, mother, daughter.... And I'll shootI'll start shooting everybody until they give me what I want.
Sanchez made this response in answer to the State's question of whether Doorbal had ever done or said anything that would make him fearful of Doorbal. The State argues that rather than showing Doorbal's propensity to commit bad acts, or the bad nature of Doorbal's character, Sanchez's testimony was relevant to explain why Sanchez did not report the kidnaping of Schiller to the police and to establish Sanchez's fear of Doorbal. We agree. Sanchez's testimony does not test the outer bounds of relevancy such that its presentation to the jury resulted in error that was fundamental or "so prejudicial as to vitiate the entire trial." Chandler, 702 So.2d at 191 n. 5. It was for the jury to assess the credibility of Sanchez's testimony, and to weigh it accordingly. No relief based on fundamental error is warranted.
Doorbal next challenges testimony by Sabina Petrescu, Lugo's girlfriend, who related that Lugo once told her that Doorbal was a killer in his native country. The State counters that Lugo also informed Petrescu that he worked for the CIA and that Doorbal assisted him in his missions. Moreover, the State asserts that Lugo told Petrescu that he, along with Doorbal, was targeting Schiller as part of a CIA mission. Thus, the State continues, Petrescu's testimony was relevant to establish why she accompanied Lugo and Doorbal on what she believed to be one of their missions. That "mission" was the one in which Lugo and Doorbal arrived at Griga's house, each with a concealed firearm, under the guise of presenting a computer as a gift to him, only to abort the plot after a fifteen-minute stay.[38] Again, the jury was entitled to weigh Petrescu's credibility as to her statements about Doorbal's activity. Her testimony was relevant as to why she accompanied Lugo and Doorbal on one of their abduction plots and it assisted in laying a framework for what she observed, including the pair's deliberate act in placing a suitcase containing syringes and handcuffs in the car with them, their purchase of duct tape before arriving at Griga's home, and their arrival at Griga's home with concealed firearms. We decline to grant relief based on fundamental error.
Finally, on this issue, Doorbal claims that error occurred when Frank Fawcett, a person with whom Lugo and Doorbal had previously conducted business, testified that he once overheard Doorbal threaten to kill his girlfriend while *956 Doorbal was speaking on the telephone. Fawcett also testified that once when he telephoned Doorbal about a certain matter, Doorbal tersely replied that he could not be bothered because he was making a bomb. Our examination of the context in which Fawcett made these comments leads us to doubt their relevancy. Their relationship to matters material to Doorbal's trial is strained at best. However, we also note that the comments were relatively isolated incidents in a protracted trial. When we further note the overwhelming amount of unrebutted evidence presented against Doorbal, we cannot conclude that Fawcett's comments "reache[d] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." McDonald, 743 So.2d at 505. Relief based on fundamental error is not warranted.

Fundamental Error in State's Closing Argument
Doorbal claims next that reversible error occurred during the State's guilt-phase closing argument. Doorbal contends that the State impermissibly commented on his right to remain silent. He also asserts that the State made an improper "Golden Rule" argument to the jury. Doorbal did not contemporaneously object to either set of comments. Therefore, the only possible basis for relief is fundamental error. We determine that no fundamental error occurred with regard to either set of comments.

A. Right to Remain Silent
During her closing argument, the prosecutor made the following statements:
It doesn't matter how many years Jorge Delgado is going to do, it's not enough.... The issue is, did he tell you the truth and what did he tell you? ...
Another thing is thatlisten to the cross examination of Jorge Delgado. Try and recall it. Never once was it anybody else but defendant Doorbal that was the hands-on killer. Lugo, along with hands-on killer Doorbal. Never once did anybody else get up once to say anything different.
Doorbal asserts that he is entitled to relief based on our opinion in Rodriguez v. State, 753 So.2d 29 (Fla.2000). The comments challenged in this case are not even in the same category as those in Rodriguez. Additionally, in Rodriguez the prosecutor made two sets of statements that could have been construed as being impermissible comments on the defendant's failure to testify. After the first comments[39] in Rodriguez, the court sustained the defendant's objection but denied his motion for mistrial. Therefore, under the proper standard of review, we determined that the trial court did not abuse its discretion in denying the motion for mistrial. See id. at 39 (citing Cole v. State, 701 So.2d 845, 853 (Fla.1997), in which we noted that "[a] motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial"). After the second set of comments[40] in Rodriguez, which were also *957 qualitatively different, the trial court overruled the defendant's objection. Under the proper standard of review, we determined that these comments were harmless beyond a reasonable doubt. See Rodriguez, 753 So.2d at 39. Neither the abuse of discretion standard nor the harmless error standard applies in Doorbal's case because Doorbal neither made a motion for mistrial, nor contemporaneously objected, with regard to the prosecutor's remarks.[41] Rather, as stated above, in our review for fundamental error we must determine whether the prosecutor's statements constituted "error that reache[d] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." McDonald, 743 So.2d at 505. When we consider the statements, along with the magnitude of physical and testimonial evidence related not only to the crimes against Schiller but also to those against Griga and Furton, we are convinced that the prosecutor's remarks at issue here did not affect the jury's verdict. Therefore, we decline Doorbal's request for relief. Finally, we note that although the standards of review applied in Rodriguez are inapplicable here, one aspect of our language in Rodriguez is entirely pertinent: "[W]e strongly caution prosecutors against making comments that may be interpreted as comments on the defendant's failure to testify or that impermissibly suggest a burden on the defendant to prove his or her innocence." Rodriguez, 753 So.2d at 39.

B. Golden Rule
Doorbal also claims that he is entitled to relief based on the following remarks by the prosecutor during closing argument in the guilt-innocence phase:
Remember [the police detective who] came in and showed you how that Omega taser works. Many of you jumped. Can you imagine how that would feel on your skin right up close? How it felt on Marc Schiller's sweating legs and ankles. But, again and again until he signed over everything. Signed over his entire life.
These statements are erroneous and needlessly violated the prohibition against "Golden Rule" arguments, because they asked jurors to place themselves in the position of the victim. However, in the absence of a contemporaneous objection, we must determine whether the guilty verdict could not have been obtained without the assistance of the error. See McDonald, 743 So.2d at 505. As noted above, a mountain of physical and testimonial evidence established Doorbal's responsibility for the crimes with which he was charged. Therefore, we conclude that the remark, though erroneous, was also isolated and did not affect the jury's verdict. No relief is warranted.
Nevertheless, we express our distress that a seasoned prosecutor would flagrantly violate the prohibition on "Golden Rule" arguments in any case, and particularly under the circumstances here. Well before admission to The Florida Bar, law students learn that they must not resort to improper "Golden Rule" arguments. Undoubtedly, prosecutors in capital cases are aware of this Court's remonstrations to all attorneys that they not violate this principle of law. A prosecutor in a capital case is entrusted to seek only justice when life or death may be at stake. We fully expect *958 that those representing the State in cases such as this will not walk the edge of reversible error, which is unfortunate conduct, isolated though it was.

PENALTY PHASE

State's Closing Argument
Doorbal further asserts that he is entitled to relief based on the State's penalty phase closing argument. He again challenges two sets of remarks, the first of which discussed aspects of Doorbal's proffered mitigation. The State argued:
And he still had a chance to bond with his father. And again, the mitigation in whatever is Ms. Laroche [sic] because of the fact that she was raped at thirteen, you cannot blame his childhood on that. It doesn't mitigate his moral responsibility. The moral responsibility as a human being, as a person that lives in society. And I don't know, but to say that where I live, if I live in Trinidad or if you live in Trinidad or you live in the United States, you don't do the things this defendant did.
Doorbal did not contemporaneously object. In Gomez v. State, 751 So.2d 630 (Fla. 3d DCA 1999), the district court reversed the defendant's conviction, based on fundamental error, due to the numerous improper comments by the prosecutor during closing argument. The prosecutor more than once referred to the defendant as a liar. She also characterized him as a "zero" who had no credibility, called his version of events a "cockamamie story," and made Golden Rule arguments in which she suggested that the jurors would not have acted in the same criminal way as the defendant if they had been in his shoes.[42]See id. at 632. Doorbal relies on Gomez for the proposition that similar remarks made by the prosecutor in his trial constitute fundamental error which warrants a new penalty phase. We disagree. In Gomez, the frequency of the prosecutor's comments was as much at issue as their offensiveness. The statements in this case were not improper comments on the evidence, and we note the lengthy nature of the prosecutor's closing argument and the isolated nature of the comments. We are convinced that this argument in this instance, even if erroneous, was not a determining factor in the jury's ultimate recommendation of death. Therefore, we deny relief.
Doorbal also contends that fundamental error occurred due to the following statements by the prosecutor:
[Griga has] already been moved into the bath tub so his blood could bleed out through the brain and what happens when Lugo calls? This is why you know that he is a cold-blooded killer. The bitch is cold. Those were his words. His words. The bitch is cold.
Not Lugo's words. Is that a value of human life? Does he deserve to spend the rest of his life in prison? See sisters and going to the library helping others? He deserves nothing. He deserves no mercy and he deserves no leniency. He deserves no respect....
It is about [Frank Griga's] goodness and about his well-being as a human. It is about Furton. It is the fact of what's left of them. He deserved no mercy for this.
Doorbal did not voice an objection to these comments during trial. We determine that while erroneous, the prosecutor's "no mercy" comments do not rise to the level of error such that the jury's recommendations of death could not have been made *959 without reliance upon them.[43]See McDonald, 743 So.2d at 505. However, we remind prosecutors that they tread on dangerous ground when they present "no mercy" arguments.

Trial Court's Refusal to Admit Letters Written by Lugo to Doorbal
During the penalty phase, Doorbal proffered letters, purportedly written by Lugo,[44] which Doorbal claimed were evidence of Lugo's domination over him and which should have been considered as mitigating evidence. The letters instructed Doorbal not to "worry about the legal side, like pleading guilty," because Lugo had everything under control.[45] The letters also reminded Doorbal "not to mention [Lugo's] name in anything illegal." Further, the letters implored Doorbal to listen to Lugo and that if he did, Lugo would "have control and bring [Doorbal] home." The trial judge explained in his sentencing order that the letters did not rise to the level of nonstatutory mitigation because they "were more indicative of Lugo's mistaken belief of [his] influence over Doorbal than [of] reality." The trial judge further noted that Doorbal turned the letters over to his attorney and did not follow Lugo's requests to shield him from any suggestion of culpability in the myriad crimes with which both were charged. Moreover, the sentencing order indicates that Doorbal stated while in custody, "If Lugo will keep his mouth shut, we'll be in the clear." Doorbal contends that he is entitled to a new penalty phase due to the trial court's refusal to admit the letters as evidence of mitigation. We disagree and determine that even if any error occurred in not admitting the letters, which it did not, such error was harmless.
In Gore v. Dugger, 532 So.2d 1048 (Fla. 1988), we determined in our review of the trial court's denial of the defendant's motion for postconviction relief that harmless error occurred during the penalty phase when the trial court refused to admit, as nonstatutory mitigating evidence, testimony concerning the defendant's domination by another individual. Though we determined that the evidence of dominance was attenuated and had minimal relevance to *960 the murder committed by the defendant, we nevertheless concluded that error occurred because "the sentencer ... [must] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character ... that the defendant proffers as a basis for a sentence less than death." Id. at 1050 (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). However, we also determined that the error in not admitting the defendant's proffered nonstatutory mitigation was harmless because "the omission of this evidence would not have affected the outcome of [the] case" in light of "five aggravating circumstances and no mitigating circumstances." Gore, 532 So.2d at 1051.[46] Similarly, any error that occurred with regard to the trial court's refusal to admit evidence of Lugo's possible domination over Doorbal, as evidenced by the letters in question, was harmless. Five aggravators, including CCP, applied to both murders. Additionally, HAC applied to the Furton murder. The quality and quantity of extant mitigation in Doorbal's case do not offset a total of six aggravating circumstances, nor would the evidence of Lugo's domination over Doorbal, in the context in which it was proffered, have changed the outcome of the instant case. No relief is warranted.[47]

Aggravating Circumstances
Doorbal challenges the trial court's decision to find several aggravating circumstances. We consider each in turn.
Doorbal first contends that the trial court should not have found both the aggravating circumstances of pecuniary gain and murder committed while in the course of a kidnaping. He contends that in finding both aggravators, the trial court essentially considered the same set of aggravating circumstances twice, because both aggravators arose out of identical facts. Doorbal's assertion is unavailing. Moreover, his "argument has been consistently rejected by this Court." Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996). The evidence clearly establishes that Doorbal acted with a dominant motive of pecuniary gain. He was immediately enthralled when he learned about Griga's Lamborghini and his enormous financial wealth, and determined to cajole Lugo into joining him in a nefarious attempt to gain access to that wealth. With regard to the "in the course of a kidnaping" aggravator, Lugo and Doorbal not only rented a warehouse to hold Griga and Furton during the planned extortion, but also purchased or otherwise procured several items to aid in the abduction, such as horse tranquilizer, duct tape, and handcuffs. They lured Griga and Furton to Doorbal's apartment after dinner and, as the sentencing order notes, once Griga and Furton were there "[they] were not free to leave." Thus, the facts independently support the trial court's finding that the murders of Griga and Furton occurred while in the course of a kidnaping. An improper doubling of aggravating circumstances did not occur.
As his next issue, Doorbal claims that the trial court erred in finding the CCP and avoid arrest aggravating circumstances. He again asserts that improper doubling occurred because both aggravators arose out of identical facts. *961 Doorbal further contends that the record does not support the finding of the CCP and avoid arrest aggravators. We disagree with both positions.
For the trial court to find the avoid arrest aggravator when the murder victim is not a police officer, the State must prove beyond a reasonable doubt that a dominant motive for the murder was to eliminate the victim as a possible witness. See, e.g., Zack v. State, 753 So.2d 9, 20 (Fla.2000). The trial court's sentencing order indicates that Doorbal and Lugo were aware that Schiller was causing all types of problems for them because he survived the attempt to kill him. Having learned how a surviving witness could haunt and frustrate them, Doorbal and Lugo made no attempt to conceal their identity from Griga and Furton because, as the record establishes, the plan from the beginning was to kill Griga and Furton once the extortion was complete.[48]
In contrast to the avoid arrest aggravator, "[t]he focus of the CCP aggravator is the manner of the killing, not the target." Bell v. State, 699 So.2d 674, 678 (Fla.1997). Four elements must be satisfied to support a finding of CCP. The murder must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage. Furthermore, the murder must have been the product of a careful plan or prearranged design to commit murder before the fatal incident. The murder must also have resulted from heightened premeditationi.e., premeditation over and above what is required for unaggravated first-degree murder. And finally, there must not have been any pretense of legal or moral justification for the murder. See Walls v. State, 641 So.2d 381, 388-89 (Fla. 1994). The "calm reflection" and "careful plan" elements are first satisfied by Doorbal's seeking out Griga and Furton in a very deliberate way, motivated at first by the allure of Griga's Lamborghini and later by visions of garnering his prodigious wealth for himself and Lugo. They are also satisfied by the deliberate procuring of devices to aid them in the kidnaping, which eventually resulted in the murders of Griga and Furton. Most notable in this vein is the procuring of the horse tranquilizer, which the medical examiner testified was likely a contributing cause to Furton's death. Careful planning is also evinced by the attempt to abduct Griga and Furton, which was aborted when the circumstances were not entirely favorable. Moreover, there is no question that heightened premeditation existed, as Doorbal was the one who first suggested that Griga become a candidate for abduction and extortion. He never attempted to hide his identity from Griga or Furton, and participated in the cold, ruthless planning of the murders with the goal of satiating his greed. The rigorous calculations in which Doorbal engaged obviate his argument that the murders of Griga and Furton resulted from emotional panic, frenzy, or fits of rage. Finally, Doorbal makes no attempt in his brief to establish that there was any pretense of legal or moral justification for the murders of Griga and Furton, nor do we conclude that there is any.
*962 In total, the trial court's decision to find the avoid arrest and CCP aggravators is very clearly supported by competent, substantial evidence. Moreover, we have consistently rejected the argument that these two aggravators should be merged into a single aggravating circumstance. See, e.g., Ramirez v. State, 739 So.2d 568, 581 n. 10 (Fla.1999); Jennings, 718 So.2d at 153. In Jennings, we stated that "the avoid arrest aggravator [was] supported by the distinct fact that the victims knew [the defendant] and that [the defendant] made prior statements concerning witness elimination." Jennings, 718 So.2d at 153. Similar circumstances apply in the instant case. We also stated in Jennings that the CCP aggravator was supported by the ruthlessness and coldness in which the murders were planned and executed. Id. at 152. Again, the events in the instant case are comparable.[49] Therefore, we reject Doorbal's assertion that the trial court impermissibly doubled the avoid arrest and CCP aggravators.

PROPORTIONALITY
Though Doorbal does not present a specific challenge on the issue, we nevertheless review his sentences of death to ensure that they are proportional to others approved by this Court. In Johnson v. State, 660 So.2d 637 (Fla.1995), we determined the sentence of death was proportional when the trial court found the aggravators of prior violent felony, pecuniary gain and HAC. The trial court also found fifteen mitigators, only one of which was statutory (age of the defendant). The same aggravators apply in Doorbal's case,[50] along with the aggravators of CCP, in the course of a kidnaping, and avoid arrest. The CCP aggravator, which applies to both murders in Doorbal's case, has been described as one of the "most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So.2d 90, 95 (Fla.1999). No statutory mitigation exists in Doorbal's case. Nor did the trial court err in assigning little weight to Doorbal's nonstatutory mitigation. The vote to recommend the death sentence in Johnson was eight to four, the same vote for each of Doorbal's death sentence recommendations. The similarity of Johnson to the instant case counsels that Doorbal's sentences of death are proportional.[51] We also agree with the trial court that Doorbal's sentences of death do not lack proportionality in light of Jorge Delgado's sentences of fifteen years and five *963 years, respectively, for his involvement in the attempted murder of Schiller and the murders of Griga and Furton. As noted in the sentencing order, Delgado's participation was much greater in the attempted murder of Schiller, with whom he had serious differences, than it was in the murders of Griga and Furton. In a similar vein, we agree with the trial court's statement that "it is clear from the evidence that [codefendant John] Mese's involvement in the murders [was] dramatically less than Doorbal['s]." We therefore conclude that Doorbal's death sentences do not lack proportionality.
On rehearing, Doorbal has asserted that Florida's capital sentencing scheme violates both the United States and Florida Constitutions under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed a similar contention in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. We find that Doorbal is likewise not entitled to relief on this claim. Of note, Doorbal argues that his death sentences were unconstitutionally imposed because Florida's capital sentencing scheme violates the United States and Florida Constitutions by failing to require that aggravating circumstances be enumerated and charged in the indictment and by further failing to require specific, unanimous jury findings of aggravating circumstances. These arguments must fail because here, one of the aggravating circumstances found by the trial judge to support the sentences of death was that Doorbal had been convicted of a prior violent felony, namely the contemporaneous murders of Griga and Furton, and the kidnaping, robbery, and attempted murder of Schiller. Because these felonies were charged by indictment, and a jury unanimously found Doorbal guilty of them, the prior violent felony aggravator alone clearly satisfies the mandates of the United States and Florida Constitutions, and therefore imposition of the death penalty was constitutional.

CONCLUSION
We have reviewed all of Doorbal's convictions and determine that they are supported by competent, substantial evidence.[52] We further determine that Doorbal's death sentences are proportional. Accordingly, we affirm Doorbal's convictions and his two sentences of death.
It is so ordered.
WELLS, LEWIS, and QUINCE, JJ., and HARDING, Senior Justice, concurs.
ANSTEAD, C.J., concurs in result only with an opinion.
PARIENTE, J., concurs as to the conviction and concurs in result only as to the sentence with an opinion, in which SHAW, Senior Justice, concurs.
NO FURTHER MOTION FOR REHEARING WILL BE ALLOWED.
ANSTEAD, C.J., concurring in result only.
While I concur in the outcome approved by the majority opinion as to both conviction and penalty, I cannot agree with that portion of the opinion discussing the impact of the United States Supreme Court's opinion in Ring v. Arizona, 536 U.S. 584, *964 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), on Florida's death penalty scheme.
PARIENTE, J., concurring as to the conviction and concurring in result only as to the sentence.
I concur fully in the affirmance of the conviction, but my concurrence as to the sentence is in result only because in my view neither Bottoson v. Moore, 833 So.2d 693 (Fla.2002), nor King v. Moore, 831 So.2d 143 (Fla.2002), directly controls the outcome of this direct appeal challenge to the constitutionality of Florida's death penalty statute in light of Ring.
I concur in affirming the sentence because one of the aggravating circumstances in this case was the previous conviction of a violent felony, resulting from unanimous guilty verdicts on contemporaneous crimes. Therefore, Doorbal is not entitled to relief under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), or Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In Apprendi, the Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348 (emphasis supplied). The Supreme Court extended Apprendi to capital sentencing schemes in Ring, but did not alter the exception for prior convictions.
Although the jury recommended death by only an eight-to-four vote, the prior violent felony aggravator makes it unnecessary to determine in this case whether the nonunanimous recommendation renders Doorbal's death sentence unconstitutional in light of the holding in Ring that the jury is the finder of fact on aggravating circumstances that qualify the defendant for the death penalty. See Anderson v. State, 28 Fla. L. Weekly S51, S57, ___ So.2d ___, 2003 WL 124468 (Fla. Jan. 16, 2003) (Pariente, J., concurring as to conviction and concurring in result only as to sentence); Israel v. State, 837 So.2d 381, 394 (Fla. 2002) (Pariente, J., concurring in result only).
SHAW, Senior Justice, concurs.
NOTES
[1] The criminal charges that flow from these facts are referred to as the "Schiller counts."
[2] Jorge Delgado was a codefendant with Daniel Lugo. In exchange for sentences of fifteen and five years, respectively, for his roles in the attempted murder of Schiller and the murders of Griga and Furton, he testified for the State.
[3] At various times, Doorbal's codefendant, Daniel Lugo, performed some billing work for both Schiller and Delgado.
[4] Both Lugo and Doorbal were avid bodybuilders.
[5] Mese was Lugo's codefendant, along with Doorbal. All three were tried together, though a separate jury decided the fate of Doorbal and Mese.
[6] Prior to creating the plot to kidnap Schiller, Delgado had expressed concerns to Schiller that the Medicare-related business that Delgado had purchased from Schiller might have been involved in Medicare fraud when Schiller was the owner. Delgado feared that he might have been inadvertently involved in continuing the fraud after he purchased the business from Schiller. Schiller denied that he was ever involved in Medicare fraud. Delgado indicated that he rejected the idea of suing Schiller for the money he claimed because a legal action brought against Schiller might expose the fraudulent activity.
[7] Schiller had previously told Delgado the code for the alarm system at his home.
[8] Schiller did not know if the gun was loaded or not. He also had tape over his eyes during these incidents, as he did for the vast majority of his captivity. On another occasion, Schiller's captors placed a gun in his mouth.
[9] These documents included drafts on his checking account.
[10] The beneficiary was changed to the name of Lillian Torres, Lugo's ex-wife. Torres was also listed as the putative "owner" of Schiller's home when the quitclaim deed was executed. At the time of Lugo's trial and conviction, Torres had not been charged with any crime. The quitclaim deed and the change in beneficiary for the life insurance policies were notarized by codefendant John Mese.
[11] Miami-area police agencies became thoroughly involved in the investigation of the crimes.
[12] When police executed search warrants at Lugo's apartment, they found the following items: a set of keys for a BMW automobile, an executed deed for Schiller's home, and a letter concerning a wire transfer from one of Schiller's accounts. When warrants were executed at Doorbal's apartment, police found the following: computer equipment and jewelry belonging to Schiller, receipts for purchases on Schiller's credit card, a receipt relating to the changing of locks at Schiller's home, and handcuffs.
[13] Certain documents listed John Mese as president and secretary of Sun Gym.
[14] Lugo and Mese were charged with money laundering; Doorbal was not.
[15] We will refer to the criminal charges that stemmed from these facts as the "Griga-Furton counts."
[16] Lugo and Doorbal injected a substance known as Rompun, a tranquilizer sometimes given to horses, to subdue Griga and Furton later in the kidnaping episode.
[17] Petrescu rode with Lugo and Doorbal to Griga's home. At trial she supplied many of the details of what happened during this visit.
[18] Lugo and Doorbal had also rented a warehouse facility in which to hold Griga and Furton captive for an indefinite period if necessary.
[19] Later, Delgado received a call from Lugo inquiring whether Delgado knew how to drive a Lamborghini, because Lugo was having trouble attempting to do so.
[20] Bartusz testified that Griga was wearing jeans, crocodile boots, and a silk shirt. Furton was wearing a red leather dress, red jacket, and red shoes, and was carrying a red purse. These items, along with other incriminating evidence discussed infra, were subsequently discovered after police executed a search warrant at Lugo's apartment.
[21] Delgado eventually noticed that blood was not only on the walls and carpet of the computer room, but also on much of the equipment and furnishings. The record also reflects that at some point before he was killed, Griga was injected with Rompun. Dr. Allan Herron, a veterinarian, provided expert testimony that the presence of horse tranquilizer in Griga's brain and liver indicated that he was alive when he was injected. Rompun slows respiration and heart rate, and causes salivation, vomiting, and a burning sensation. Dr. Herron stated that there are no clinical uses for Rompun in humans.

Medical examiner Dr. Roger Mittleman testified that Griga was a homicide victim. While he could not pinpoint the exact cause of death, he opined that Griga died from one or more of the following causes: an overdose of horse tranquilizer; asphyxia from strangulation, with the overdose of horse tranquilizer contributing to the asphyxiating effect; or blunt force trauma to his skull and the consequent bleeding (exsanguination) from this blunt force.
[22] Dr. Mittleman, the medical examiner, opined that the effects from horse tranquilizer were consistent with the cause of Furton's death. He also stated that her death was consistent with asphyxia.
[23] Lugo gave this black leather couch as partial payment to Mario Gray for his assistance in disposing the bodies of Griga and Furton and other items. Lugo knew Gray from Sun Gym.
[24] Police eventually found Griga's yellow Lamborghini abandoned far off a Miami-area roadway.
[25] Upon executing a search warrant at the warehouse in June 1995, police found the following items: a fire extinguisher, flint, an owner's manual for a chain saw, and a mask respirator. They also found Griga's auto club card and numerous receipts with his name on them.
[26] Delgado served as a lookout while Lugo and Doorbal dismembered the corpses. He noticed that Lugo and Doorbal were packing the body parts tightly into drums. He also noticed a collection of heads, hands, and feet in a bucket. He was certain that the chain saw had been used. He surmised that the hatchet must also have been employed, because he heard several loud thumps consistent with those made by a hatchet. Expert testimony confirmed that the corpses were indeed at least partially dismembered by use of a hatchet.
[27] When police executed a search warrant at Lugo's apartment, they found not only the blood-stained computer equipment, but also the following items covered with blood: a television, gloves, towels, carpet and padding, and clothing. The blood on these items was matched to Griga. During the search, police also found a computer printout listing Griga's bank accounts, Griga's driver's license, thirty syringes (some filled and some not), a vial marked "Rompun," a stun gun, duct tape, binoculars, and several firearms and ammunition.

Further, police found the following incriminating items when they executed search warrants at Doorbal's apartment: Rompun and several foreign passports bearing Lugo's photograph but names other than "Daniel Lugo."
[28] Gray assisted in disposing of the torsos and limbs (legs and arms) of both Griga and Furton, which were tightly packed in 55-gallon drums. He also found the site in southern Dade County where the body parts would be disposed of. The drums were placed about 100 meters apart.
[29] On June 9, 1995, one day after being apprehended in the Bahamas, Lugo led police to the spot where the torsos and limbs were buried. He did not give any indication, however, of the location of the heads, hands, and feet of Griga and Furton.

In July 1995, acting on an anonymous tip, police found a collection of human heads, hands, and feet in the Everglades off Interstate 75, along with a knife and a hatchet. The appendages were matched to Griga and Furton. Although Lugo and Doorbal had attempted to pull all of the teeth out of the heads to prevent police from positively matching them to Griga and Furton, a single tooth remained in one of the heads. The tooth and head were matched to Griga. Doorbal had also related to Delgado that he and Lugo had chopped off the fingertips from each of the hands, to deter police further from matching the hands to Griga and Furton. Expert testimony confirmed that the fingertips had indeed been separated from the hands.
[30] Those charges were: first-degree murder (two counts), conspiracy to commit racketeering, racketeering, kidnaping (two counts), armed kidnaping, attempted extortion, grand theft (two counts), attempted first-degree murder, armed robbery, burglary of a dwelling, first-degree arson, armed extortion, and conspiracy to commit a first-degree felony.
[31] In a footnote in his initial brief, Doorbal describes the following items he believes were illegally seized: credit card receipts for jewelry purchases; Doorbal's automobile registration for his Nissan 300ZX; account information for Doorbal's account at a brokerage; a letter from Marc Schiller demanding repayment for the value of money and property taken from him; a fax from Schiller's private investigator to an attorney retained by Lugo, with regard to the return of property to Schiller; a Jewish New Year card and a hotel receipt, both of which belonged to Schiller; a receipt from a locksmith for changing the locks at Schiller's home; a cell phone, pager, and knife belonging to Lugo; two "false passports" bearing Lugo's photo; a warehouse lease signed by Lugo; a bill for Delgado's cell phone; a check for $67,845 which was signed by Lugo and was payable to Sun Gym; checks signed by Lugo in payment for pool care at Schiller's home; a copy of Lugo's probation order; photos of the residence of Winston Lee (whom the State alleged was a racketeering target of Lugo and Doorbal, although the plan to abduct and extort Lee was never executed); and a brass statue of an eagle.
[32] We are required to follow the United States Supreme Court's interpretations of the Fourth Amendment. See art. I, § 12, Fla. Const.; Bernie v. State, 524 So.2d 988, 990-91 (Fla.1988).
[33] Schiller believed he had a deal with his captors that he would turn over his assets if his wife and children were not harmed and were allowed to leave Miami for South America.
[34] Another friend of Griga's, along with Griga's domestic assistant, also identified Doorbal as being in Griga's home on May 24, 1995.
[35] The supporting affidavit indicated that Griga's yellow Lamborghini had been found abandoned off a Miami-area roadway.
[36] Because we determine that the initial search warrant was valid, we need not consider Doorbal's argument that information and evidence gathered from the initial search led police to seize evidence in subsequent searches that constituted "fruit of the poisonous tree."
[37] Doorbal avers that his codefendant, Mese, objected to certain statements at issue. However, the trial judge specifically informed counsel for each defendant that no defendant would be allowed to share in the objection of a codefendant. Therefore, Doorbal did not preserve the issue for review. See Johnson v. State, 726 So.2d 359, 360 (Fla. 1st DCA 1999) (defendant did not preserve for review the issue of admissibility of testimony when only his codefendant contemporaneously objected); see also Charles W. Ehrhardt, Florida Evidence § 104.1 (2001 ed.).
[38] Lugo arranged another meeting with Griga later that evening, which set in motion the events which led to charges of kidnaping, attempted extortion, and double murder.
[39] These comments alluded to the defendant's lack of an explanation for who else but himself and another State witness (who was a codefendant and who arranged a plea bargain in exchange for testifying for the State) could have been in the room where the murders were committed. See Rodriguez, 753 So.2d at 37.
[40] These comments alluded to the fact that although the jurors were asked during the jury selection process whether they could "listen... to both sides of the story ... there was nothing in the direct or cross examination of any witness who testified that pointed to any other person being involved other than [the witness who testified for the State in exchange for a plea bargain] and [the] defendant. There were no two sides." Rodriguez, 753 So.2d at 37.
[41] We further note that in the other cases on which Doorbal relies with regard to this issue, review for fundamental error was not the applicable standard.
[42] The defendant objected a total of sixteen times to the prosecutor's remarks.
[43] The cases on which Doorbal relies are distinguishable. In Urbin v. State, 714 So.2d 411 (Fla.1998), we reversed the sentence of death based on a lack of proportionality. We also noted that the prosecutor engaged in a closing argument that was one of the most egregious examples of misconduct that we had seen, including ridiculing actions of the defendant's mother, using variants of the word "execution" at least nine times, and repeatedly dehumanizing the defendant and inviting the jury to disregard the law. See id. at 420-22. The prosecutor's conduct in the instant case, while erroneous, does not rise to the deplorable level of Urbin. We distinguish Rhodes v. State, 547 So.2d 1201 (Fla.1989), and Garron v. State, 528 So.2d 353 (Fla.1988), on the same basis. In Rhodes, the prosecutor compared the defendant to a vampire without justification, improperly argued that the HAC aggravator applied based on the defendant's actions after the body was dead, and clearly misstated the law with regard to a mandatory twenty-five year sentence for first-degree murder. The events in the instant case are not comparable. In Garron, the frequency and egregiousness of the comments justified reversal of the defendant's death sentence and remand for a new trial. The prosecutor in Garron repeatedly misstated the law and injected emotion and fear into the trial "in such a way as to render the whole proceeding meaningless." Garron, 528 So.2d at 359. While unfortunate, the prosecutor's remarks and behavior at issue in the instant case are not as egregious as those of the prosecutor in Garron.
[44] The trial court's sentencing order briefly indicated some doubt as to whether Lugo actually wrote the letters, but tacitly assumed that he did so.
[45] Doorbal received the letters while he was imprisoned on charges related to the instant case.
[46] Because the error in Gore was harmless, Doorbal's reliance on Gore is ultimately unavailing.
[47] To the extent that Doorbal argues that the trial court erred in not finding the statutory mitigator that Doorbal acted under extreme duress or was under the substantial domination of another, we also deny relief. The trial court indicated that it instructed the jury on this statutory mitigator "at the request of the defense and solely in an abundance of caution."
[48] Lugo indicated to Delgado that he was frustrated with Doorbal for his killing of Griga before the extortion could be completed. Moreover, Lugo mentioned to Delgado that he had previously planned to have corrections officer John Raimondo kill Furton and dispose of both her body and Griga's. See also Jennings v. State, 718 So.2d 144, 151 (Fla. 1998) (noting support for finding avoid arrest aggravator in facts that defendant did not conceal his identity and in his previous statement that "if he ever committed a robbery, he would not leave any witnesses").
[49] That the murders of Griga and Furton occurred before the extortion reached its fruition does not obviate the ruthless and cold nature in which they were plotted. As the trial court stated:

The fact that Doorbal was unsuccessful in the completion of his mission does not detract, in any way, from the fact that he had a cold, calculated and premeditated plan to kill both victims and dispose of their bodies, completely without legal and moral justification.
[50] The HAC aggravator applies only to the murder of Furton.
[51] Also, in Knight v. State, 746 So.2d 423 (Fla.1998), we approved dual death sentences when the same five aggravators applicable to both murders in the instant case were found by the trial judge: prior violent felony, commission during a kidnaping, avoid arrest, pecuniary gain, and CCP. In the instant case, HAC also applies to the Furton murder. The defendant in Knight also had nonstatutory mitigation at least as compelling as Doorbal's, as the trial judge determined that the defendant suffered from a degree of paranoia, was a victim of childhood abuse, and had had an impoverished upbringing. No statutory mitigators were found in Knight, just as in the instant case. The jury voted nine to three in Knight to recommend sentences of death. The similarities of Knight to the instant case provide further support for the conclusion that Doorbal's sentences of death are proportional.
[52] We have also analyzed the cumulative effect of the errors that occurred in the guilt and penalty phases and, based on this analysis, conclude that Doorbal is entitled to no relief.